## GIBSON, *et al.* v. CARSON'S ADM'R.

1. Although the complainant may make out, by proof, a case which entitles him to relief, yet he cannot recover upon a bill, the allegations of which are not adapted to the case proved.

2. *Semble*, the declarations of a father made simultaneously with the execution of a deed of gift to a daughter, that the deed was his will; it would save him the trouble of making a will; he was to enjoy the property during his life, &c. —when coupled with the fact, that he was an habitual drunkard, of but ordinary understanding; and that the deed divested him of the present right of possession of all his estate, both real and personal, satisfactorily show, that he was ignorant of the legal effect of what he did, and that he supposed he was executing a testamentary paper. And a deed executed under such circumstances, may be set aside, on the ground of surprise.

3. *Semble*, the wife acquires no right, *by marriage*, to the property of the husband, and can not maintain a bill in Equity, to set aside a deed of gift executed by him previous to the marriage, on the ground that he continued in possession, and she married him under the impression that the property was his.

This cause comes here by writ of error from the Chancery Court sitting at Cahawba.

THE defendant's intestate filed his bill, stating that he had but one child by his first marriage, who several years previous to the 8th of May, 1824, intermarried with Thomas Gibson; that his wife and son-in-law, often persuaded and importuned him to convey his property to his daughter, and he as often refused, until on that day, being at a drinking house in the neighborhood of his residence, and under the influence of spirituous liquors, by the persuasion of his son-in-law, he consented to execute voluntary conveyances of all his property, to his daughter, and her then and future increase. Gibson accordingly, while the intestate was in this state of mind, prepared two deeds, which were then executed by intestate; the one conveying his land, and the other his slaves and other personal property, to his daughter, and her then and future issue; which deeds were taken possession of by Gibson.

It is alleged, that the intestate had but little property, yet the deeds did not reserve to him the property conveyed for the maintenance of himself and wife during life; he was consequently dissatisfied with what he had done, and went to Gib-

son's in a few days, and not finding him at home, he informed Mrs. Gibson of his dissatisfaction, and asked her for the deeds, who replied, if he was unwilling for her to have the property, he could have the deeds; and accordingly, handed them to him. The intestate carried the deeds home with him, intending to burn them, and informing his wife of his intention, threw them into the fire; his wife made an effort to rescue them, and succeeded in rescuing one of them, which intestate, until within a few months before filing his bill, supposed to be so obliterated as to be illegible and unintelligible. It is further charged, that intestate's wife immediately carried the deed to Gibson, and related to him the circumstances under which she prevented it from being burnt.

It is then stated, that intestate's first wife died on the 13th of August, 1828, leaving no other issue than Mrs. Gibson; and on the 11th of November, 1829, he married a second wife, by whom he has five children. At the time of the intestate's second marriage, he was in possession of the lands and slaves conveyed by the deeds of May, 1824, (except the slaves he had given to his daughter and son-in-law) and his wife believed him to be the owner thereof, and looked to them as a source for her maintenance. Intestate alledges, that he gave to his daughter, upon her marriage, and since, negroes and other property, of the value of twenty-five hundred dollars; among the negroes so given. were four negroes, embraced by the deed of May, 1824. On the 17th April, 1832, Gibson caused the deed for the slaves and other personal property, to be proved by one of the subscribing witnesses, and recorded in the clerk's office of the County Court of Dallas, telling the witness not to make the registration publicly known.

It is further stated, that after the second marriage of the intestate, and the birth of two children, and while he was still in possession of the land and slaves, except those given to Gibson and wife as aforesaid, the intestate was very sick, and called on Gibson to write his will, asking him if the deeds were still in existence, who affirmed, most solemnly, they were destroyed; Gibson wrote the will, devising the land and bequeathing the slaves, except those given to him and wife, to the second wife of the intestate, and her issue. That will, it is alleged, has been destroyed by intestate, and cannot now be exhibited.

Mrs Gibson died previous to the drawing of the will, leaving five children under twenty-one years of age.

When the intestate heard that Gibson had had the deed recorded, he spoke to him on the subject, but he refused to give him any satisfactory explanation.

It is further alleged, that on the night of the third of November, 1837, all the negroes left the intestate's house, and went into the possession of Thomas Gibson, his son Robert C. Gibson, and son-in-law, James Campbell, who refused to deliver them up on demand, asserting a right to hold them under the deed.

Intestate alleges, that he is about sixty-seven years of age, infirm and unable to labor, and has but little property left, except the land, of which he apprehends an effort will be made to divest him at some future time.

Thomas Gibson, Robert C. Gibson, James Campbell and wife, and the infant children of Thomas Gibson, are made defendants; and the bill concludes with a prayer, "that the titles to said land, slaves and other personal property, may be decreed to have been all along, and still to be in your orator, and that the said deeds may be set aside and cancelled, as having been obtained without consideration, and fraudulently, from your orator, and as being in fraud of the rights of his wife and children, and that said slaves be restored to your orator; and that the said Thomas Gibson, Robert C. Gibson and James Campbell, be decreed to pay what is reasonable and right, for the use of said slaves, from the time of their seduction and elopement, until surrendered up." There is also a prayer for general relief.

A copy of the deed for the slaves and other personal property, is exhibited with the bill, from which it appears that the gift is to Mrs Gibson and her children born at the date of the deed, or thereafter to be born, without any reservation in favor of the intestate or any other person.

Without attempting to recite the answers of the defendants, it may be enough to say, that the answer of Thomas Gibson is a denial of the equity of the bill, and a statement of facts going to exculpate himself from all impropriety of conduct.

The defendants, Campbell and wife, and Robert C. Gibson, say, they believe that the deeds in question, were executed without any trick, fraud, &c., admit the detention of the slaves

by Thomas Gibson, and conclude their answers with a general demurrer.

The infant defendants answer in usual form, by their guardian, *ad litem.*

Depositions were taken as well by the complainant as the defendants, but as the testimony is not contradictory, it will be quite sufficient to recite it substantially, so far as it need be noticed. It is shown that the deeds were made and executed by the intestate, at the time and place alleged; that the intestate at that time, was about fifty years of age, and though an habitual drunkard, was not then intoxicated, but was apparently, as intelligent as usual. No effort on the part of Gibson, was observed, to induce the execution of the deeds, but he wrote them by the intestate's directions, who said, they were such as he desired; that his wife had requested him to make them; that they were not made to defraud, as he was not in debt, and they would save him the trouble of making a will, &c.

*Further:* The intestate said, the deeds were his will, and as he had ordained it to be done, that he was to enjoy all the property during life, which latter remark was assented to by Gibson. The witnesses do not recollect that the slaves were bequeathed by the will which Gibson wrote for intestate some years before his death, but the land was thus disposed of. Although the intestate was not drunk when he executed the deeds, he made his mark instead of writing his name, assigning as a reason therefor, that his hand was too unsteady to write; and when the deed for the slaves was recorded, eight years thereafter, Gibson requested the subscribing witness, not to make it public.

Upon the hearing, the Chancellor was of opinion, that the execution of the deeds was induced by the fraud, imposition, or undue influence of Gibson, or else the intestate misapprehended the legal effect of the deeds, and interest they conveyed to the objects of his bounty. Thereupon, he adjudged that the deeds be set aside and wholly vacated, the slaves be delivered up to the complainant; and that the master *take* an account, and report the value of the hire of the slaves, &c. since they went into Gibson's possession; also, the names and description of the increase of the slaves, if any, &c. To review the decree of

the Chancellor, the defendants have prosecuted a writ of error to this Court.

EDWARDS and G. W. GAYLE, for plaintiffs in 'error, cited 2 Kent's Com. 451; 1 Chitty's Prac. 827; 3 McC. Rep. 477; 1 Hill's Rep. 316; 1 Story's Eq. 235; 3 Eccl. Rep. 461, 254; 4 Dess. Rep. 518; 2 H. & Johns. Rep. 422.

BOLLING, for defendant, cited Kennedy's heirs and ex'rs v. Kennedy's heirs, 2 Ala. Rep. 593; 1 Dess. Rep. 250, 300; 3 ib. 273; 3 Madd. Rep. 191; 2 H. & Johns. Rep. 292; 6 ibid. 435; 1 Munf. Rep. 527; 3 Cow. Rep. 572; 2 Ves. sr. Rep. ——; 3 Ves. & B. Rep. 119; 5 Ves. Jr. Rep. 27, 67; 6 ibid. 267; 9 ibid. 292; 10 ibid. 209; 13 ibid. 136, 14 ibid. 273; 1 Madd. Ch. 224; 1 Cox's Rep. 333; 1 Johns. Ch. Rep. 482.

COLLIER, C. J.—The grounds upon which the bill in this case, seeks to set aside the deeds are, 1. Because they were executed in consequence of the importunities of the intestate's first wife, and his son-in-law, Gibson. 2. Because Gibson, by his persuasion, at a time when the complainant was drunk at a drinking house, in his neighborhood, induced him to execute the deeds in question, by which he divested himself of all the property, of which he had previously been the proprietor. These are to be regarded as the *gravamen* of the bill, and the allegations of the subsequent acts and declarations of the intestate, Gibson and others, are to be considered as merely ancillary, or explanatory of the transaction.

The proof in the cause does not show that the deeds were executed by the intestate, in consequence of the intreaties used, or influence attempted to be exercised by his wife, son-in-law, or any one else. And instead of being drunk at the time of the execution of the deeds, it appears, that the intestate was apparently as intelligent and self possessed, as usual. There is then, an entire failure to make out by proof the case stated by the complainant, and the *onus probandi* being thrown upon him by the answers, it is clear that the decree of the Court of Chancery cannot be sustained. In attaining this conclusion, we are not to be understood as determining, that the proof is insufficient to authorise relief, but merely that there is such a want of harmony between the *allegata* and *probata*, as to ren-

27

der the evidence under the pleading, wholly ineffectual.. Clements, adm'r v. Kellogg, by her next friend, 1 Ala. Rep. N. S. 330.

We might here close this opinion, but my brothers think it best to, look into the. evidence, and inquire whether, if the bill were adapted to it, the result would be different from that we have expressed. That equity has jurisdiction to set aside, cancel, or reform deeds or other instruments, is abundantly shown by the case of Kennedy's heirs and ex'rs v. Kennedy's heirs, 2 Ala. Rep. 593, *et post;* and this has been done in some cases in which there was no pretence of actual or positive fraud. Thus in Slocum and wife v. Marshall, *et al.* 2 Wash. C. C. Rep. 397, it appeared, that a conveyance had been made of her real estate by a daughter to her father, immediately before her marriage, under a belief that she would be benefitted by the same, and that the property conveyed by the deed would become her's after the decease of her parent; and where the operation of the conveyance was to deprive the daughter of the estate; the Court decreed a conveyance of the property, and an account of the proceeds of the part which had been sold, so as to effect the justice of the case, and to give to the daughter the property to which she would have been entitled, had not the conveyance been made. This decision was not made on the ground that the transfer of the property by the daughter, was a fraud on the marital rights of the husband, or that fraud or imposition was meditated by the father; but the Court was of opinion that as the father's will had proved ineffectual for securing to the daughter the consideration which induced her to make the deed, a Court of Equity could do nothing less, than to set aside the deed, as having been made under a mistake, and for a consideration which had failed.

Jones v. Robertson, 2 Munf. Rep. 187, bears a more striking analogy to the case before us, than any we have seen. In that case it appears, Mrs. Robertson sent for Jones to prepare a writing for her to execute, changing the disposition of her property, which she had previously made by will; he accordingly prepared a deed of gift, with which she expressed herself satisfied, and executed it. It appeared from the previous and subsequent declarations of Mrs. Robertson, that she intended to dispose of her estate by will, and was surprised when informed, that the instrument executed would have a different effect.

The Court set aside the deed upon the ground of surprise, on the part of Mrs. Robertson. In the Earl of Bath and Montague's case, 3 Ch. Cas. 56, *et post*, which was most elaborately examined, the Court held, that *no other surprise*, except that which is accompanied with fraud and circumvention, will be a good ground to set aside a deed in equity. See, also, Jeremy's Eq. Jurisd. 366. But Mr Justice Story supposes that there is nothing technical or peculiar in the word *surprise*, as used in Courts of Equity. "When a Court of Equity relieves on the ground of surprise, it does so upon the ground that the party has been taken unawares, that he has acted without due deliberation, and under confused and sudden impressions. The case of Evans v. Llewellyn, 2 Bro. Cha. {Rep. 150, is a direct authority to this very view of the matter. There may be cases where the word *surprise*, is used in a more lax sense, and where it is deemed presumptive evidence of fraud. 1. Foub. Eq. 125. But it will always be found that the true use of it is, where something has been done which was unexpected, and operated to mislead or confuse the parties on the sudden, and on that account, has been deemed a fraud. Irnham v. Child, 1 Bro. Ch. Rep. 92; Marquis of Townshend v. Stangroone, 6 Ves. Rep. 327, *et post*; Twining v. Morrice, 2 Bro. Ch. Rep. 326; Willan v. Willan, 16 Ves. Rep. 81, *et post*." 1 Story's Eq. 133, note.

My brothers are of opinion that the evidence in the cause shows, that the intestate was surprised in the execution of the deeds. His declaration that they were his will; they would save him the trouble of making a will; he was to enjoy the property during his life, &c. when coupled with the facts, that he was an habitual drunkard, of but ordinary understanding; and that the deeds divested him of the present right of possession of all his estate, both real and personal, are considered by them as satisfactory to show that he was ignorant of the legal effect of what he had done, and that he really supposed the deeds were merely testamentary papers. While I will not dissent from this view, I decline the expression of an opinion upon the point, inasmuch as it is unnecessary to decide it. But conceding that this conclusion of fact is correct, and I am prepared to say that it furnishes a sufficient reason in equity, why the deeds should be set aside; and if upon their face, they ap-

peared to be testamentary dispositions of property, the filing of the bill would operate a revocation.

The fact that the intestate had the possession of the slaves and other property in question, does not render the deeds void, as a fraud upon the marital rights of the wife of his second marriage—even if she was ignorant of their existence. The wife acquires no right *by marriage* to the property of the husband. True, he may make a settlement upon her, but until this is done, he cannot be controlled by her in making such disposition of his estate as he thinks proper. With no propriety then, can the wife be regarded as the purchaser, by the simple act of *marriage*, of her husband's estate.

We do not deem it necessary to consider whether, or how far, the subsequent acts of the intestate, or Thomas Gibson, may be looked to, as explaining the transaction. What we have said, will most probably lead to an adjustment of the rights of all concerned; and have only to add that the decree is reversed, and the bill dismissed without prejudice, at the cost of the defendant in error, to be levied of the estate of his intestate, &c.