13   681
107   341
13   681
133   578
13   681
135   607

## McKINLEY v. IRVINE, ET AL.

1. A reference to the master, to ascertain the sum which by the decree is ordered to be paid to the complainant, does not render it interlocutory, when the principles are settled by the chancellor by which the amount is to be ascertained.

2. An allegation in a bill, by which the complainant deduced his title to three shares of stock, in an unincorporated company, averring that the shares were purchased by one H, principally with the means of one J M, to whom the certificates of the stock were delivered, and a power of attorney executed to one B, by H, to transfer the title to J M, but which was not done. That J M departed this life, and B and H executed a power of

86

attorney to J T M, to make such title to said shares of stock, as was in them. That the complainant became the purchaser of said shares of stock from J T M, and his brother, J H M, the heirs and distributees of the said J M, who for themselves, and the said J T M, as attorney for H and B, by deed conveyed to complainant, said three shares of stock, is not sustained by proof, that J T M, and J H M, were entitled to the stock as the *devisees* of their father, J M, and not as his *heirs*, the title being put in issue.

3. An agent appointed by the trustees of an unincorporated land company, to bring its affairs to a close—to receive all monies due from, and to adjust, settle, and compromise with the debtors of the company—and having authority to receive the stock of the company at $475 a share, in the final settlement with the purchasers of lots, and lands of the company—cannot purchase in the stock of the company for his own use; but such purchase will be regarded as being made on behalf of his principals.

4. After such agency had ceased, he might become the owner of stock in the company, but could not thereby entitle himself to retain in his hands money which he had collected as agent, and attorney at law for his principals, unless insolvency, or some independent ground of equitable interposition exists. The non-residence of the trustees, is no ground for the interference of chancery, that fact being known to the agent, at, and previous to his purchase of the stock.

5. Though a trustee cannot make a profit by the purchase of the trust property, the objection can only be raised by the persons interested.

6. Expenses incurred by trustees in the erection of a tavern, and public county buildings, though made in good faith, and though they tended greatly to enhance the value of the town lots, cannot be allowed as a credit to the trustees in their account, unless such expenditures were authorized by the authority under which they acted, or the shareholders expressly, or impliedly, consented to the outlay.

7. When the subscribing witness to a deed, voluntarily incapacitates himself from proving it, by becoming interested in it, the deed cannot be proved by secondary evidence.

8. To authorize the proof of documents at the hearing, *viva voce*, reasonable notice must be given that such proof will be offered.

9. All the trustees of a private land company, who have participated in the execution of the trust, or their personal representatives if they be dead, should be parties to a bill filed by a stockholder, for the settlement of the trust estate.

10. It is too late to amend a bill, after proof taken on both sides, and the cause finally heard, when the amendment would put in issue a different title from the one previously asserted. The rule, it seems, is different in respect to parties, or mere clerical mistakes.

Errror from the 28th Chancery District. Before the Hon. D. G. Ligon, Chancellor.

McKinley v. Irvine, et al.

THE bill was filed by the plaintiff in error. The facts, as shown by the bill, answers, and proof, so far as they are material to the points decided by the court, may be thus briefly stated. In March, 1818, a company was formed, composed of many individuals, called the Cypress Land Company, who purchased lands at the public sales, for the purpose of laying out the town of Florence, establishing ferries, &c. On the 12th March, 1818, the company appointed seven persons trustees, for the management [and disposal of the property, viz: Leroy Pope, Thos. Bibb, John Coffee, Jas. Jackson, John Childress, Dabney Morris, and John McKinley, who, by indenture accepted the trust, and covenanted to stand seized in trust for the common benefit of the members, in proportion to their interest, and to perform the articles of association; the 2d article of which divided the capital stock into 408 shares, to be divided among the members, in proportion to the purchase money paid by each. Certificates of stock to be issued by the trustees, registered and numbered, and were made assignable. By other articles the trustees were empowered to rent, or sell land, establish ferries, &c.; to lay out the town of Florence; to make donations of lots for public use, &c.; to appoint sub-agents; and to receive five per cent. commissions on receipts. Share holders to pay expense of laying out town, &c. Certificates to issue in the name of the trustees, to make payment out of joint funds. To keep journals of their proceedings open to inspection, &c. and once a year to be submitted to stockholders. The profits to be distributed annually, and as soon as possible after the term of credit on sales, final settlements to be made. Assignees of stock to have the same rights as original holders.

The trustees accepted the trust, and signed the certificates of stock, and made sundry sales, amounting to $300,000. That Coffee, Jackson, and McKinley were the acting trustees, of whom McKinley is the survivor, and resides in Kentucky. That in 1834 the trustees adopted a resolution, that the shares should be taken in payment of debts, at $475 a share, and that the debts upon an average, were due in July, 1824. That on the 10th September, 1834, a power of at-

torney was executed to complainant, authorizing him, under the control of McKinley, and Jackson, to settle the business, and collect debts, &c. That he acted under this power for several years, and made many settlements in stock, at the value of $475 a share, and collected considerable sums of money, which he paid over to said trustees. That in October, 1841, he exhibited his account as agent, and applied for a settlement, demanding payment on three shares of stock, then in his hands for collection, belonging to John T. and James H. Montgomery. That McKinley refused to allow more than $475 on each share, whilst complainant insisted the shares should be increased by the interest on the debts, accumulating since the resolution fixing the value of the stock, and then paid over all the money in his hands, except $2,639, exclusive of some personal demands against McKinley; and that for this amount, suit has been instituted, and is now pending against him, in the circuit court of Lauderdale.

That since the institution of the suit he has purchased the three shares of the Montgomerys, taking their deed, as *heirs and distributees* of James H. Montgomery, and the deed of J. T. Montgomery, as agent of Hazard & Buncker, in whom the legal title was vested, which bears date 3d September, 1842. That the shares, with the accruing interest, are worth from $1,000 to $1,200 each. The complainant also claimed an interest in another share, assigned to him by T. & J. Kirkman, during his agency.

The complainant alledges, that the trustees have failed to comply with the stipulations of the trust, under which they acted, and makes McKinley and Pope, the surviving trustees, and the legal representatives of Jackson and Coffee, parties to the bill. The prayer of the bill is for an injunction and account, and for a set off in equity, for the amount due on the shares of stock—for a decree for the residue, if any, and for general relief.

McKinley answered the bill, and admitted the organization of the company, acceptance of the trust, &c., as stated in the bill. That for the purpose of advancing the interest of the stockholders, it was agreed to erect, at the expense of the company, a hotel, court house, &c., which was made

known to the bidders, and greatly enhanced the price of the lots, and that Hazard, the former owner of the stock, was present, heard the announcement, and made no objection, and insists that under the articles of association, the trustees should be allowed to do any thing which was for the benefit of the company. That the hotel built pursuant to this promise, cost $30,000, and the public buildings, $20,000.

That he applied to complainant as his agent, to ascertain the outstanding stock, and was told, there were three shares in the hands of one Montgomery, of Philadelphia; and upon inquiring of Montgomery, respondent was referred to complainant. That he refused to settle with complainant at a higher rate than $475 a share, agreeably to the resolution of the trustees, and that after that allowance is made, he is still indebted to the company $4,500. The answer contains much other matter, not necessary to be noticed. The other defendants also answered the bill in general, denying the allegations, and calling for proof.

Evidence was taken on both sides, which so far as it is important, will be found embodied in the opinion of the court.

The chancellor, at the hearing, decreed to the complainant the value of the stock held by him, and directed an account to be taken, in which the master was directed not to allow a credit for the cost of the erection of the hotel, and other public buildings. From this decree this writ is prosecuted.

HOPKINS, for plaintiff in error.

1. The defendant in error derives his title in his bill to the shares of stock, from two of the sons of James Montgomery, deceased, as the heirs at law and distributees of their father. It is alledged in the bill, that James Montgomery was at his death the sole owner of the whole beneficial interest in these three shares. The legal title to all the real estate of the Cypress Land Company was in the trustees, and the articles of association required them to sell and convey it all. The beneficiaries were entitled to receive from the trustees dividends upon the money only collected from the rents and sales of the real estate. The interest, therefore, of James Montgomery, deceased, in the shares, was personal property, and

belonged to his personal representative appointed by the State, in which the surviving trustees who were the debtors, resided. The bill therefore shows no title to these three shares, and is therefore bad upon demurrer, and without a demurrer, should be dismissed for want of equity. Story's Eq. Pl. § 254, 319, 320, 504, 505, 508, 509, 510, 728, 447.

2. The evidence proves that James Montgomery died in Philadelphia, where his domicil was at his death. His interest in the stock was personal property, which formed no part of the assets that belonged to his personal representative, appointed by Pennsylvania. It was under the protection of the laws of the States in which the debtors reside, and the Pennsylvania executor or administrator was incapable of transferring to a purchaser any interest in the shares. 4 How. Rep. (U. S.) 467; 8 Porter, 401, 402; Story's Confl. Laws, 421, 422. The proper personal representative should be a party. Story's Eq. Pl. § 209, 541.

3. The complainant in his bill derives his title from the heirs and distributees of James Montgomery. The evidence proves (deposition of Montgomery) that he acquired such title as he has from the devisees of James Montgomery. For this variance between the title stated in the bill and the title proved, there ought to be a decree for the plaintiffs in error. The title stated must be proved : no proof can have any effect which does not support some allegation in the bill. Sto. Eq. Pl. § 263, 264, 254; 10 Wheaton, 189; 10 Peters, 178; 1 Ala. R. 330; 3 Id. 421; 3 Porter, 473; 2 Ala. Rep. 153; Story's Eq. Pl. 257, 258, 264. The last three sections, to show the fact that he derived title from the devisees, is not in issue, and cannot be proved, and the proof, if offered, can have no effect, and there is no proof of the title he states in the bill.

4. It appears from the bill, that the complainant was the agent of the trustees, for one purpose, among others, of paying to such stockholders as would receive it, $475, in full discharge of each share that might be delivered to him for this sum. He was employed by the trustees, and was their agent. He was accountable to them, and not to the stockholders or beneficiaries. He is bound to pay to the trustees, and not to any beneficiary, the money he has collected as

their agent. Story on Agency, 208, § 217. As the agent of the trustees, he acted illegally in asserting the interest of the estate of James Montgomery, deceased, against his principals. Story on Agency, § 217.

5. It appears from the bill, that the complainant retained a large sum of the money he had collected as agent, because the trustees would not pay the sum he claimed to be due upon these three shares. The sum which he withheld from his principals, he had in his possession when he purchased the three shares. It is not stated in the bill what price he paid, or agreed to pay, for these shares. In the absence from the bill of any statement of the price, the bill must be treated as one in which it appeared that the money he withheld from his principals was equal in amount to the price. His bill shows he had a certain amount of money in his hands that belonged to his principals, and contains nothing to show it was less than the price. As he was the agent of the trustees when he undertook the performance of duties to the Montgomerys inconsistent with those of his agency, and had the money of his principals in his hands when he bought the shares, the purchase must be treated as if he had made it while he was acting as the agent of the trustees. By retaining their money, he continued under an agent's disability to purchase for himself with the money of his principals. If his principals would allow him, upon his request, the price he paid for the shares, he could have no farther demand upon the transaction against them. He does not alledge in the bill that he had informed the trustees of the price, and asked to that amount a credit with them against the sum he lawfully withheld. He had a legal defence to the extent of $475, for each of the shares against the action at law. His principals have never refused to allow this sum for each of these shares. The bill contains no equity, and ought to have been dismissed. Story's Eq. Pl. § 447; 4 How. Rep. (U. S.) 467; 6 Cranch's Rep. 149; Peters's C. C. Rep. 364; Prevost v. Graby, 2 Wash. C. C. Rep. 441.

6. The deposition of Montgomery proves the complainant received the shares for collection, while he was acting as the agent of the trustees, and resigned his agency, as he stated in his letter to Montgomery, because McKinley, the surviv-

ing trustee, refused to pay more than $475 per share, and that he might prosecute the claim he made for a larger sum upon the shares. The same deposition proves that the complainant informed Montgomery he withheld the money from his principals, and that while he was acting as the agent of the trustees, he endeavored to purchase the shares for himself, and finally bought them, that he might make of the purchase the foundation of a bill in equity to protect himself from the payment of the money he had retained in violation of his duty as an agent. He paid for the three shares, as the same deposition proves, $1,533 33, in land assessed at this sum, of less value doubtless than the sum the surviving trustee offered to pay in discharge of the certificates of stock. The complainant is bound by the agreement with the vendors of the shares, to pay them $500 in money, in the event he should succeed in preventing a judgment against him for the money which he holds of his principals! That money he received as an agent and employed to speculate upon for his own benefit. Upon the evidence, the case is more unfavorable to the complainant than on his bill, which is itself destitute of all equity. He acted illegally in taking the shares for collection, while he was the agent of the debtors. He acted illegally in refusing to pay his principals the money he had received as their agent, and in withholding it to coerce such a settlement of the value of the shares as he required, and equity ought not to afford any relief upon his claim, which is connected with, and founded upon so many unlawful and unjust acts. 6 Ala. Rep. 20, 22; 2 Vesey, jr. 319, 320. The deposition of Weakly proves that the trust funds are insufficient to pay $475 on each of the outstanding shares, and there is no evidence that outweighs his.

7. The decree directs the value of the shares to be paid to the complainant, and the value of them to be ascertained according to rules prescribed by the decree. It is an unconditional decree, for the value of the shares in favor of the complainant. The decree directs the money withheld by the complainant, as well as the expenses which had been paid in the execution of the trust, to be deducted from the gross amount of the receipts by the trustees, and that the master shall allot to the complainant upon each of the shares, one-

McKinley v. Irvine, et al.

408th part of the remainder. The decree disposes of the money withheld, because it is made a part of the basis of the decree in favor of the complainant for the value of the shares, and the basis could not afterwards be altered by the chancellor without altering the decree itself. In effect, the decree leaves the money retained by the agent, where it leaves the amount of the expenses, in the hands that held it when the decree was made, and disposes of one amount as finally as it does the other.

8. If the decree did not make a final disposition of the money in the hands of the agent, it would still be final, because it settled the rights of the parties. The complainant has no right to the money he withholds, as he has a decree against all the defendants for the value of the shares; all of whom reside in Alabama except McKinley, and it is not alledged in the bill that he, or either of the other defendants, is insolvent. It is not alledged that McKinley had no property in Alabama. 2 Ala. Rep. 170.

9. The part of the share sold by the Kirkmans to the complainant, was purchased by him in 1836, when he was the acting agent of the trustees, with funds in his hands belonging to them to a much larger amount than the purchase money he paid for his interest in the share. It belongs, therefore, to the trustees, and as he does not state the trustees refused to allow him the sum he paid for it, the relief asked in relation to this share is opposed by the objections made upon the merits, to any decree in his favor for the other shares. The bill does not state the price he paid for it.

10. The power of attorney from Hazard to Buncker authorized him to transfer to James Montgomery such shares as belonged to Hazard & Buncker jointly. One of the three shares belonged to Hazard & Co. and the other two to Hazard only. Buncker had no authority to transfer the latter, and it is not proved that Buncker had an interest in the other.

11. The decree denies the right of the trustees to charge the trust fund with the cost of the public buildings of the county of Lauderdale, which the trustees caused to be erected, to increase the value of the town lots. It makes no allowance to them for the cost of the hotel, which the trustees

87

erected to improve the value of the trust fund, although the proceeds of the sale of the hotel are charged to the trustees, as a part of their receipts for the company. If the complainant were entitled to the value of the shares, the cost of all these buildings should be deducted from the receipts, to ascertain the sum out of which the shares would be entitled to dividends. 1 Sch. & Lef. Rep. 363, 369, 384; 2 Id. 567, 580; 4 Howard (U. S.) 565; 2 Ala. Rep. 573. It was unnecessary for the chancellor to conclude his decree with an order that the cause should be retained till the report of the master should come in. By the operation of law, it would be retained longer than the order directed.

12. The proof made by Willis Pope of the execution by Hazard & Buncker of the power of attorney alledged in the bill, which evidence is stated in a bill of exceptions signed by the chancellor was incompetent. No deed or other writing can be proved on the hearing, except on an order previously obtained from the chancellor after due notice to the adverse party. 1 Hoffman's Ch. Prac. 490, and note 3; 1 Johns. Ch. Pr. 559; 2 Johns. Ch. R. 481; 4 Hen. & Munf. 441; 2 Id. 124. As the complainant was a subscribing witness, and had disabled himself from giving evidence, by acquiring an interest, other evidence was incompent to prove the hand-writing. 3 Stew. & Porter, 227.

13. As the power was not proved, the legal title to the three shares is in Hazard & Co. and S. Hazard, and if there were a bill with equity in it, they would be indispensable parties, as would be also all the living trustees, and the personal representatives of such as were dead when the bill was filed. Story's Eq. Pl. § 209, 541.

E. W. Peck and L. P. Walker, contra, submitted the following points for the defendant in error:

1. As to the title of the defendant in error to the shares of the stock of said company, claimed by him, and, first, as to the share No. 390. This share was purchased by defendant in error of T. & J. Kirkman.

The plaintiffs in error substantially admit the defendant's title to this share, but insist as to this share, he must be considered as a trustee for the company, and alledge, that at the

time of the purchase, he was the agent and attorney for the company, and had funds of the company in his hands, and that it was his duty to have bought it for the company, &c. Now, in the first place, this is defensive matter, and should have been proved. In the next place, it is only necessary to look at the defendant's power of attorney, to see that he had no authority to buy stock for the company—and if he had no authority to buy for the company, then it was clearly lawful to buy on his own account. It seems that this is all that is necessary to say as to this share.

2. As to the shares No. 187, 397, and 399. These shares were conveyed to the defendant by deed, from the Montgomery's, who had the equitable title, and by deed from Buncker and Hazard, who had the legal title. It was objected that these deeds were not legally proved. There is in the answers a strong implied admission that these shares belong to the defendant, by alledging that he is only entitled to be allowed $475 per share, for reasons stated in the answers. Now, as to the proof of these deeds, we insist the proof offered by the defendant was sufficient, but if that was defective, the plaintiffs in error took the deposition of John T. Montgomery, who proved the power of attorney, given by Buncker and Hazard, by authority of which, their deed was made, he also proved the purchase of the shares by the defendant, for the sum of $2,000, and also the execution of the deed from the Montgomery's to him. This proof being made by the plaintiff's own witness, they can with no propriety be heard to deny the fact of purchase. But these shares might as well have been purchased by parol as by deed, and the evidence was unquestionably sufficient for this purpose.

The objections made to the proof of these deeds were two: 1. That they could only be proved by the subscribing witnesses. 2. That they could not be proved *viva voce* on the hearing. As an answer to the first objection, the court is referred to the case of Barringer and Rhodes v. Snead, 3 Stewart's R. 201, and 9 Por. R. 605, and as to the second objection, to the case of Levert v. Redmond, 9 Porter, 79.

The objection made to the purchase, on account of the relation which the defendant bore to the plaintiffs in error, is

considered and answered when speaking of the same matter in relation to the share No. 390.

If, then, it was lawful for the defendant to purchase these shares, he, by the purchase was invested with all the rights and privileges of those from whom they were purchased.

If the vendors might, by bill in equity, have called upon the plaintiffs to make a settlement of the affairs of the company, and to state an account, with the shareholders, for the dividends, &c., so could the defendant, and it seems to us to require no argument to prove, that the trustees of a joint stock company, can be called to account in equity, at the suit of the shareholders—indeed, they can have a remedy in no other court. If these views be correct, then there is equity in the bill, whether the defendant is entitled to the set off prayed, or not. But the case made by the bill showed he was entitled to the set off. McKinley, the only surviving trustee had moved out of the state, and was a permanent citizen of Kentucky—he was, in violation of the fundamental laws of the company, disposing of the property, refusing to account, and withdrawing all the means of the company out of the state—this, it seems to us, gave the defendant the right to retain the funds of the trustees in his hands, for his security, until the plaintiff in error could be called to an account. The argument that he received the money as the agent of the trustees, is without force. Can it be said with any propriety, that he was bound to pay over the money in his hands, and then pursue his remedy in a foreign jurisdiction? We contend that no principle of professional obligation, or of morals either, required this at his hands. The trustees had utterly neglected, and disregarded their duties touching the management of the trust property—they had been for years dealing with the trust property for their own benefit, and speculating in the stock of the company. Now, we ask, if trustees, in such a case, may not be called to an account, by the *cestuis que trust*, in a court of equity, and if the trust property has been wasted by their negligence, or improper conduct, be held responsible for the loss; or, if they have made profits out of the trust property, be held accountable for such profits? In support of these propositions they cited Fonb. Eq. 475, 477; 80 1. J. C. R. 37; 4 Id.

586, 305; 11 Vesey, 92; 13 Id. 407, 590; 18 Id. 246; 4 Wend. 209; 2 McCord, 185; 2 R. C. 230.

3. The decree of the chancellor is interlocutory merely. This is evident from the character of the decree itself, and the direction of the chancellor, "that said cause be retained under this order and decree, until the report of the master come in as directed," and is wholly unlike the cases of Weatherford v. James, 2 Ala. Rep. 170, and Bank of Mobile v. Hall, 6 Id. 143. The writ therefore was prematurely sued out.

CHILTON, J.—1. We think the writ of error should not be dismissed. The decree directs the value of the shares to be paid to the complainant, which value is to be ascertained by rules which it prescribes. The amount in the complainant's hands, as well as the expenses, are required to be deducted from the gross sum of the proceeds, and complainant is declared to be entitled on each share to one four-hundred and eighth part of the residue. Thus settling the rights of the parties, we think it comes within the principle settled in the case of Weatherford v. James, 2 Ala. Rep. 170, and Kennedy's Heirs, &c. v. Kennedy's Heirs, Ib. 573, and must consequently overrule the motion to dismiss the writ of error. That a reference was awarded to the master to ascertain the sum, which by the decree is ordered to be paid complainant, does not change or affect the character of the decree, or render it interlocutory merely. See Bank of Mobile v. Hall, 6 Ala. Rep. 141.

2. The main question, and that to which we shall chiefly direct inquiry, respects the title made by the bill to the shares in controversy. The complainant must show by his allegations in the bill, that he is entitled to the relief which he seeks, and if he fail to set forth every essential fact necessary to make out his title to maintain the bill, the defect will be fatal. The general rule is, that no relief can be granted upon matters not charged, although the same appear in evidence, for the decree must be predicated upon the allegations as well as proof. "The reason for the rule," says Judge Story, "is, that the defendant may be apprised by the bill, what the suggestions and allegations are against which

he is to prepare his defence." Story's Eq. Pl. § 257. Indeed, nothing is in issue except such facts as are charged in the bill, and all proof of facts not stated, either generally or circumstantially, must be regarded as without the issue, and consequently irrelevant, and a decree on such facts cannot be supported. Wilkes v. Rogers, 6 Johns. Rep. 565; Irnham v. Child, 1 Bro. Ch. C. 94; Crocket v. Lee, 7 Wheat. Rep. 522; Jackson v. Ashton, 11 Peter's Rep. 229; Gresley Eq. Ev. 22-3; Story's Eq. Pl. § 28; Morgan v. Crabb, 3 Porter's Rep. 470; Boazman v. Draughan, 3 Stew. Rep. 243; Murray's adm'r v. Mason's adm'r, 8 Por. 211; Clemens v. Kellogg, 1 Ala. Rep. 330; Gibson v. Carson, 3 Ala. Rep. 421.

In Gilchrist v. Gilmer, 9 Ala. Rep. 985, it is said, the general rule, that the proof must correspond with the allegations, applies only when the evidence discloses a cause for relief, different from that set up by the party pleading it.

The allegations of the bill in regard to the title of the complainant in this case are as follows: After stating the attempted settlement between complainant and defendant, McKinley, in October, 1841, when the complainant exhibited a statement of the amount of money in his hands, collected as agent for the trustees, and demanded the payment of three shares, numbered 187, 397, and 399, which he says were placed in his hands by John T. Montgomery, for himself and his brother, James H. Montgomery, under express authority to obtain payment of what was justly due thereon, and after averring McKinley's refusal to allow more upon each share than $475, and complainant's withholding the sum of $2639 61, to pay said shares, and the subsequent suit against him by the trustees for the same, the bill states, "Your orator further states, that since said suit has been instituted, he has become the purchaser of said three shares of stock from John T. Montgomery, and his brother, James H. Montgomery." The bill then states, that the shares were purchased by Samuel Hazard and Samuel Hazard & Co., but principally with the means of James Montgomery, deceased, the father of complainant's vendors. That under some arrangement, the certificates were delivered to him, the said James, and a power of attorney was executed by Hazard to one Buncker to transfer the certificates to said James

Montgomery, now deceased, but the transfer was not executed. That since the death of James Montgomery, Hazard and Buncker have made a power of attorney to John T. Montgomery, authorizing him to make such title to said shares as was in them. The bill then proceeds, "Your orator became the purchaser of said shares from said John T. Montgomery, and his brother, James H. Montgomery, *the heirs and distributees of said James Montgomery*, who, for themselves, and the said John T. Montgomery, as attorney in fact for Samuel Hazard and Charles N. Buncker, and in their names, by indenture, bearing date the 3d day of September, 1842, conveyed to your orator said three shares of stock, with all the rights and benefits appertaining thereto." Thus it is shown by the bill, that the equitable interest in those three shares was in James Montgomery, deceased, and this equitable interest the complainant acquired from his two sons, the heirs and distributees of said James, while he acquired the legal interest from Hazard and Buncker, by their deed, executed by John T. Montgomery, their agent. This is *the case* made by the bill, and upon which the complainant must recover, if he recovers at all. Nor is this averment of the manner in which he acquired the title unimportant, but it is essential to the validity of the bill. In Wilburn v. Ingleby, 1 Mylne & K. 61, a bill brought by a derivative shareholder in an unincorporated company, for an account against the directors, alledging that they had made a profit to themselves at the expense of the company, was held demurrable, because it only stated the plaintiff to be a shareholder by purchase; but it did not specifically state the mode in which he acquired his share, and the manner of his holding, and that he had performed the conditions which, by the rules of the company, were required to be performed, in order to validate the transfer. See also Story's Eq. Pl. 215.

It is unnecessary for us to examine the question made by the counsel for the plaintiff in error, as to the power of a foreign administrator to transfer the stock so as to vest in complainant a right to sue. The proof in this case shows that the two sons of James Montgomery, deceased, did not acquire the stock as his heirs and distributees, but by devise from

their said father; the will bearing date the 15th day of March, 1834, and duly proved and recorded in the register of wills for the city and county of Philadelphia. The question presented upon the record is, whether the proof sustains the case made by the bill. We think it clear that it does not. A title acquired by will as devisees was not put in issue by any of the pleadings, and forming no part of the complainant's case, could not properly be made the foundation of a decree in his favor. See cases above cited, and Story's Eq. Plead. § 257, 258, 264. In James v. McKernon, 6 Johns. R. 564, it is said, the good sense of pleading, and the language of the books, both require that every material allegation should be put in issue by the pleadings, so that the parties may be duly apprised of the essential inquiry, and may be enabled to collect testimony in order to meet it. Smith v. Smith, 4 Johns. C. Rep. 281. So also, in Buck v. McCaughtry, 6 Monroe's Rep. 82, it was held that an allegation of suggestion of falsehood will not let in proofs of the suppression of truths. So, if the complainant seeks to rescind a contract on account of deficiency of land sold, he will not be allowed to rescind for fraud which he does not aver in his bill. Gouverneur v. Elmendorph, 5 Johns. Ch. R. 82; Thompson v. Jackson, 3 Randolph's Rep. 504; Ibid. 263; Parker v. Carter, 4 Munf. 273; Boone v. Childs, 10 Peters's Rep. 177.

The complainant having shown the equitable title to have been in the deceased Montgomery to the three shares, it is perfectly clear that he could not recover without showing the title became vested in himself. How does he show this? By a particular description of the conveyance under which he claims, a deed from two *heirs* and *distributees* of the decedent, one of them acting also as the attorney in fact of Buncker & Hazard, the holders of the legal title. Now, granting that the rule laid down in Wilburn v. Ingleby, is too stringent, and that it would be sufficient if the complainant had averred generally that he was the assignee of the three certificates of stock, which assignment to him vested in him a *bona fide title* thereto, and that under such general averment, he might well have adduced proof showing his assignor derived title in any way in which it could be acquired, still the party can derive no benefit from the argument. The

averment is, that " the complainant *became the purchaser* in a particular way which is specifically alledged, and the court is called upon to deduce the conclusion of title from the specific facts set out as constituting it.    These facts are put in issue by the pleadings, and must be proved as charged.    If we are to regard, as shedding any light upon this subject, legal analogies, (and Lord Hardwicke and Redesdale go so far as to hold that there should be the same certainty in a bill in equity that there is in a declaration—Story v. Ld. Windsor, 2 Atk. 632 ; Mit. Pl. 284,) it is well settled in the practice in the law courts, that if a party take upon himself to state a particular estate, where it was only required of him that he show a general, or even a less estate, title or interest, the adversary may traverse the allegation, and if it be untrue, the party will fail.    1 Chit. Pl. 228-9, marg. p. and authorities there cited ; see also Pharr & Beck v. Batchelor, 3 Ala. Rep. 237.

So it is held that in an action on the case against the sheriff for levying under an execution against the tenant, without paying the landlord a year's rent, if the plaintiff, though unnecessarily, profess to set out the terms of the tenancy as to the time of payment of rent, *&c.* and misdescribe them, the variance will be fatal.    1 Chit. Pl. 229.    Another illustration of the rule is given by the same author.    Thus, a general freehold title, *liberum tenementum*, may be pleaded either in trespass or in an avowry in replevin, and under it the defendant may prove any estate of freehold, either in fee, in tail, or for life ; but if he state, though unnecessarily, a seizin in fee of a particular estate or interest, and the other side traverse the allegation, it must be proved as stated.    " There are instances," says Mr. Chitty, " of material matter being alledged with an unnecessary detail of circumstances or particularity.    The *subject matter* of the averment is material and relevant, and the evil is, that the essential and immaterial parts are so interwoven, as to expose the whole allegation to a traverse, and the consequent necessity of proof to the whole extent to which it is carried in the pleading.

These citations may suffice to show what the rule is at law.    It is insisted, however, by the counsel for the defend-

ant in error, that the averments as to the purchase from the heirs and distributees of the deceased Montgomery, may be rejected as surplusage, and that the defendant in error has a right in equity to have the account which he seeks, by virtue of the conveyance of the *legal title* from Buncker & Hazard to him of the three shares of stock. But we apprehend, that, assuming the allegations in the bill to be correct, Buncker & Hazard had no power to transfer an equitable right of action; for the bill states, the shares were purchased mainly with the money of James Montgomery, deceased, and were actually transferred to him by delivery, and a power of attorney was made by the holder of the legal title to execute to him a conveyance thereof. The bill thus showing the equity, coupled with the certificates of the shares, to be in the deceased Montgomery, it may be well questioned whether *any* title would pass by the conveyance of Buncker & Hazard, while the certificates remained in the possession of James Montgomery, deceased, or of his representative. Be this as it may, it is perfectly certain the court of equity would never proceed to decree relief without having the owners of the equitable interest, and who, in that court, are considered *the* real owners of the stock, before it. Were the practice otherwise, justice would be administered by halves—the rights of parties decided upon who have had no means of asserting them, and the defendant, who is compelled to obey the decree, is left to protect himself as well as he may, by future litigation. Story's Eq. Pl. § 72. But, as before stated, the averments here as to the purchase, and the manner of showing a derivative title, are material allegations, and without which the bill would be evidently bad. Mr. Daniell, in his able work upon chancery practice, thus states the rule as applicable to such averments: " In pleadings at common law, it is held that in stating a derivative title, a party claiming by inheritance must show *how* he is heir, viz., as son or otherwise, and if he claims by *mediate,* and not by *immediate* descent, he must show the pedigree. Stephens on Pl. 340. *It appears to be right, upon every principle, that the same rule should be observed in bills in equity.*" 1 Dan. Ch. Pr. 369. The same author, p. 363, lays it down that a plaintiff must not only show in his bill an interest in the subject mat-

ter of the suit, but he must also make it appear that he has a proper title to institute a suit concerning it, (Ld. Redesdale, 155;) for it very often happens, that a person may have an interest in the subject matter, and yet for want of compliance with some requisite forms, he may not be entitled to institute a suit relating to it. For example; an executor has a right to personal property of his testator, but he must prove the will before he can assert it. If he does not aver in his bill that the will had been proved, it is demurrable. Story's Eq. Pl. § 625; Cooper's Eq. Pl. 212; Humphreys v. Ingledon, 1 Pr. Wms. 753; Daniell's Ch. Pr. 364. In the case before us, the plaintiff claims as a purchaser from the *heirs* and *distributees.* If we allow the averment to be sufficient, without showing how the two Montgomerys, as heirs and distributees, acquired the right to dispose of the stock, the defendant would have a clear right to defeat the bill by showing plaintiff did not acquire title in that way; that the said Montgomerys were not heirs or distributees; that no distribution had been made; or, that the complainant below was *executor de son tort.* How, then, can such averments be regarded as surplusage or immaterial, when the whole case may be made to depend upon them? Suppose the defendant, having put in issue their heirship, had proved they were in no ways related to the decedent, could it be tolerated at the trial, to allow the complainant to offer proof that they were *legatees?* Why, the defendant might say, I have never before heard of such title. It was not in issue. I came prepared to defeat the title in issue by proving complainant had none, because none *descended* to his vendors as he averred. A will is wholly without the case, and proof concerning it irrelevant and improper. But if the will had been set up, I could have defeated the alledged title, averred to be derived under that, in various ways: either by showing that it was surreptitiously obtained; was never recorded; was revoked, or, was not the will of the supposed testator. Now, it seems to result, if a court of equity were to allow such title to prevail, the party might be taken upon surprise—the case goes off upon a title never once indicated by the pleading, and which the defendant, by the well established rules of equity practice, could not have been allowed to controvert by proof.

And if on the final trial, the cause is continued for amend-
ment and proof upon the *will*, as is insisted should be done,
even after the hearing upon error in this court, being defeat-
ed upon that title, he might in the same way set up a title by
deed from the ancestor, and thus a complainant may, under
this practice, take as many chances for success, as he may
suppose he has grounds for setting up distinct titles.    A
chancery suit would rarely fail, under such a system, to cum-
ber the docket for many years.    We instance such examples
as illustrating the principle, and not as otherwise applying to
this case.

The authorities fully sustain the position, that where the
complainant relies solely upon his title for the account which
he seeks, he must show his title in the bill; and if he claim
as a derivative purchaser, he must deduce his title regularly,
and aver it correctly.    An example is found in the case of
Penny v. Hoper, Bunbury's Ex. Rep. 115; Ib. 129, where
the lessee of a lay improprietor filed his bill against an oc-
cupier for an account of tithes, held, that as the right of the
plaintiff depended solely upon his title, he must not only de-
duce it regularly, and the existence of the lease, but that the
person from whom it is derived had the fee.    Lord Digby v.
Meech, Bunb. 195; Danl. Ch. Pr. 370-1; Story's Eq. Pl.
257, *et seq.*    It also results, that being compelled to aver his
title, he is required to prove it if put in issue, and proof of a
different title than that averred will not sustain the bill.

We have devoted thus much space to this point, not be-
cause of any great difficulty involved in it, as we conceive,
but because it is conclusive of the case in this court, against
the defendant in error, and the contrary proposition has been
urged with much zeal and ability upon our attention.

3. We proceed to state our conclusions upon the other
points in the cause.

It is objected, that the proof shows the complainant, at
the time he received these three shares from Montgomery, as
also the share from the Kirkmans, was the agent of the trus-
tees of the Cypress Land Company, to adjust its business
and buy in the shares in the payment of debts due the com-

pany, at the rate of $475 per share, as well as attorney for the said trustees, in possession of the books and papers, and retained to attend to the suits, &c., which should it be necessary to institute in the prosecution of the business; and it is insisted that he could not acquire an interest adverse to his principals, and that the purchase of the stock by him must be regarded as made for his employers, if he has shown a title to it, and to be paid for by them at the rate of $475 per share. It is well settled that an agent employed by a trustee is accountable only to him and not to the *cestui que trust;* and a sub-agent is ordinarily accountable to the superior agent who employs him and not generally to the principal. See Story on Ag. § 217, a, and authorities there cited. In this case there was no privity between the agent, Irvine, and the stockholders. He derived his authority directly from the surviving trustees, who were charged with the distribution of the proceeds of the trust according to the articles of association into which they had entered, and it was the duty of the complainant to have accounted with the trustees, and not with those who may have been the holders of certificates of stock. This duty the complainant recognized by tendering his account, but claimed the right to retain of monies collected by him, what he regarded the value of the shares placed in his hands by Montgomery, as the agent of Montgomery to collect what was justly due thereon, pending his agency for the defendants. We think the complainant could not, pending his agency for respondents, contract with the Messrs. Montgomery, any relation which would justify the withholding from his principals the funds he had received by virtue of his agency. "The duty of thus guarding the interest of the principal, is not confined," says Judge Story, " to cases where the agent may sacrifice his interest by attempts to further his own ; but the same particular policy extends to cases where the interests of strangers are sought to be asserted by the agent, adversely to those of the principal." The agent cannot assert the right of third persons to defeat the demands of his principal, nor dispute his title. Com. on Ag. 255, § 217, and cases cited.

The same principle obtains both at law and in equity, so where an agent had collected money for his principal, he

McKinley v. Irvine, et al.

cannot be converted into a trustee for a third person by notice of his claim, but is bound to pay it over. Ib. 256; Nicholson v. Knowles, 5 Madd. Rep. 46; 2 Story's Eq. § 317.

It is however replied by the counsel for the defendant in error, that there was nothing in the power of attorney given by McKinley, Jackson, Bibb and Pope, to Irvine, which directly, or by implication, denied to him the right to receive the shares as agent, or to purchase them upon his own account. The power under which complainant below acted, after reciting the authority of the trustees to appoint agents, &c., proceeds, "The trustees being desirous to bring to a close the affairs of said trust, to that end, and for that purpose, have appointed, and by these presents do appoint, Jas. Irvine, for them, &c., to receive of and from the debtors of said company all sums that may be due and owing from the debtors of said company, and in default to bring suit therefor. We further authorize him to adjust, settle and compromise with all debtors to said company, under such regulations and orders in writing as John McKinley and James Jackson, the present acting trustees, may from time to time give, and upon payment made agreeable to such order, or otherwise, to execute and deliver in our names deeds with warranty, for all lands and town lots so paid for. We hereby ratify and confirm what he may do within the scope of his power, dated 10th Sept. 1834." Signed, sealed, &c. It appears, that previous to the execution of this power of attorney, the complainant below, in connection with his then partner, had been the agents and attorneys of the trustees, and that one of the books delivered to them contained a resolution, dated 28th October, '33, entered into by the trustees, authorizing "the stock of the Cypress Land Co. to be received at $475 per share, in the final settlement with purchasers of lots and lands belonging to the company." It further recites, that although the acting trustees may lose by this arrangement, they have determined to submit to it for the purpose of closing the business as speedily as possible. Which is signed by McKinley and Jackson, and the acting executors of John Coffee. Under the foregoing authority the complainant avers that he acted for several years, and

"made many settlements based upon the value set upon the stock by said resolution."

Now, it is true, the agent has no direct authority conferred upon him to buy in the shares for the trustees, but merely to receive them in liquidation of demands due the company at the price of $475, but does it follow that he may deal in such shares himself, pending the agency, or become agent for others, to enforce collection from his principals? We think not. Suppose, as an illustration of the rule, that the agent employed to settle the business, by receiving and procuring the cancellation of shares at $475, had himself, under a belief that the shares were worth more, purchased in the whole of them on his own account. It is most obvious the design of his agency, and the object of his principal swould have been defeated. The same principle holds good, if, instead of permitting them to circulate, and to get into the hands of the debtors to the company, he had received them as agent for the holder, to collect what he deemed due upon them. In either case, the principal object of the agency, the speedy settlement of the affairs of the company, which had been thrown into confusion by the destruction of the books, &c. by fire, would have been thwarted, and what is true of all, is equally applicable with respect to any less number of the shares; for as to them, the agency cannot be carried out. "By the employment, the principal contracts for the disinterested skill, diligence and zeal of the agent for his exclusive benefit." Story on Ag. § 210. He cannot act for his own benefit on the subject of the trust, so long as the fiduciary, or confidential relation exists, Greene v. Winter, 1 Johns. Ch. Rep. 26; Parkhurst v. Alexander, Ib. 394; Bank v. Collins, 7 Ala. Rep. 95. We feel constrained, according to our view of the law, to declare, that under the proof in the case, the purchase made on the 19th July, 1836, of T. & J. Kirkman, of an interest in the share numbered 390, by the complainant, must be regarded as made on behalf of his principals; and to hold that the funds due the trustees, could not be properly withheld for the payment of the three shares to Montgomery. The case does not rest upon the doctrine of resulting trusts from the use of the funds,

in the purchase of the stock, but upon the well established law repecting the powers and duties of agents.

4. But it is contended again, that the three shares were acquired after the termination of the agency, and that they are not affected thereby. We do not see how the bare fact of Irvine's being the debtor to the trustee for monies collected as agent, can, after the termination of the agency, and when he is sued for the funds, constitute any impediment to the purchase by him of shares in the stock; the disabilities of an agent grow out of the relation, and cease with it, but while he may purchase, a court of equity would not aid him in availing himself of such purchase to prevent a recovery at law by his principal, of monies collected by him as agent, and which he illegally withheld. In the absence of all intervening grounds of equity, such as removal, or insolvency, the court will not legalize the unlawful detention by stopping the funds in his hands. It is true, McKinley resides out of this State, but he so resided when complainant purchased the shares, and long before, as is shown by the bill and the proof, and complainant was fully advised of the fact when he purchased, having been his agent and attorney for many years. Under such circumstances, as against his liabilities for the funds in his hands, with respect to which his fiduciary relation still exists, a court of equity will not aid him.

5. The counsel for the defendant in error again insist, that the respondents should not be allowed to urge, that complainant could not purchase shares pending his agency, as the authority conferred to receive them at $475 was an attempt to profit themselves at the expense of the *cestuis que trust*, and thus each party in turn invokes the rule, that a trustee shall not act for his own benefit and profit, in a contract on the subject of the trust. True, "it would be an extremely wrong thing," as the Lord Chancellor said in Norris v. Le Neeve, 3 Atk. Rep. 37, "to permit a trustee to use the information he gains as such trustee, by purchasing in for himself." See also, Green v. Winter, *supra ;* 3 P. Wms. Rep. 249, n a.; Morrell v. Paske, 2 Atk. R. 52. He is considered as purchasing for the *cestuis que trust*, if he elect to avail himself of the purchase. But this record presents the case of trustees purchasing from the *cestuis que trust,* and although

courts of equity regard such purchases with jealousy and suspicion, yet they are allowable if the purchaser make a full and fair disclosure, and take no improper advantage. Kennedy v. Kennedy, 2 Ala. Rep. 572; Johnson v. Johnson, 5 Ala. R. 90. The persons who have sold their shares are not the parties complaining, and it cannot be material to the interest of the complainant, whether the shares to which he lays no claim, are in the hands of the trustees, or of the original holders.

6. As to the expenses incurred by the trustees in the erection of a tavern and the public buildings for the county of Lauderdale, in the town of Florence, we do not think they can be placed to their credit in the accounting. There can be no question that such contribution of the funds tended greatly to increase the sale of the town lots, and perhaps the value of other property in the neighborhood of the town, but they were not warranted by the powers conferred on the trustees, by the articles of association under which they acted. The declaration of trust under which they acted, defines their powers with clearness, and nothing therein, either expressly or impliedly contained, could justify them in expending the trust money, or effects, in the erection of a court house, jail, clerk's offices, or tavern. And although these improvements were doubtless made in good faith, yet it is established that a trustee shall only be allowed for necessary expenditures. "It must be, and always has been the anxious wish of a court of chancery, to save a trustee from harm, while acting in good faith, but a misapplication of the trust property, by going out of the trust, can never be permitted to injure the *cestui que trust* without his consent." Kent Ch.; Greene v. Winter, 1 Johns. Ch. R. 40; Fontaine v. Pillet, 1 Ves. jr. 337; Bostock v. Blackney, 2 Bro. 653; 2 P. Wms. 453; 3 Atk. Rep. 441; Findley v. Wilson, 3 Litt. Rep. 393.

It is proper to remark however, that the trustee should only be charged with the value of the tavern lots at the time of sale, and not the amount increased by the improvements. If the owner of the shares at the time these expenditures were

89

being made, gave his consent to this appropriation of the funds by the trustees, or if his consent could be implied from his silence, were he present and fully advised of the action of the trustees in that behalf, and interposing no objection, it is clear he would be estopped from insisting the loss should fall exclusively on the trustees, but his interest would be taxed with the loss *pro rata*, and this equitable right to contribute would follow his shares, and attach to them in the hands of his assignee. But we have carefully examined the evidence, and do not think it furnishes any authority for saying the shares are thus affected.

7. The chancellor also erred in permitting the witness, Pope, to give evidence at the hearing of the power of attorney from Buncker and Hazard to Montgomery, which complainant, as a subscribing witness thereto, had, by his voluntary act rendered himself incapable of proving. Bennet v. Robison, 3 Stew. & P. R. 227; 3 Phil. Ev. C, & H's Notes, 1267. Besides, it was not proper to receive *viva voce* proof at the hearing, without reasonable notice to the opposite party that such proof would be offered. Consequa v. Fannin, 2 Johns. C. Rep. 483-4; Emerson v. Buckley & Stone, 4 H. & Munf. Rep. 441.

8. To render the bill formal, and make the adjudication decisive of the interest of all the parties concerned, it is proper that all the persons who signed the declaration of trust, and who have participated in its execution, or their personal representatives, if they are dead, should have been made parties. They may be interested in several ways, and especially as respects the misapplication of the trust funds to the erection of public buildings, &c. Story's Eq. Pl. § 209. If however, it should appear that the parties who have not been joined, are in no wise connected with the suit, not having taken upon themselves the execution of the trust, and that their interests are not to be affected by the decree, there would be no necessity for making them parties. But where a suit is brought to enforce a trust, and there are divers trustees, they should all be made parties; for all of them, says Judge

McKinley v. Irvine, et al.

Story, have a community of interest, and otherwise there might be different suits brought against each trustee. Eq. Pl. § 210. We suggest whether the character of the bill in this case, is not different from a bill exhibited against one of several trustees, who are implicated in a common breach of trust. Story's Eq. 213; Munch v. Cockrell, 8 Sim. R. 219.

It is unnecessary to remand this cause, as we have satisfactorily shown, we believe, that were the party allowed to amend his bill, and aver a title derived through a devise by James Montgomery, it would make a new case, because it would amount to the assertion of a different agreement, or title, than 'the one set up in the present suit. Besides, after the proof on both sides has been taken, and the cause finally heard, it is too late to amend. The rule has never been carried so far within our knowledge as to permit a party under such circumstances, to amend as to substantial averments respecting his title. The statute authorizing the court to permit amendments any time before the hearing does not embrace the case. But this point is concluded by the adjudications of this court—Bryant v. Peters, 3 Ala. Rep. 171; Evans v. Bolling, 5 Ala. 555. See also, Story's Eq. Pl. § 336, 614, 886; Mit. Pl. by Jeremy, 55; Lube's Eq. Pl. 62; 1 Daniell's Ch. Pr. 478. The rule is less stringent in respect of parties, and the court may permit amendments as to clerical mistakes upon the trial. Gill's heirs v. Cummings's heirs, 6 Ala. Rep. 564; 2 Sch. & Lef. 11; Rugely v. Harrison, 10 Ala. Rep. 746.

The decree of the chancellor is reversed, and a decree is here rendered dismissing the bill. Let the plaintiff in error recover the costs of this court and of the chancery court.