## YATES and others *v.* TISDALE and others.

When a person is in danger of being doubly vexed by adverse claimants, whether by suit commenced or only threatened, he may file a bill of interpleader. Nor does it matter whether one claim be of a legal and the other of an equitable character.

Although the manager of a lottery is not compelled to make more than one whole payment on a prize; and is not to be subjected to a multiplication of rights and suits by the division of it among after buyers and will be protected by paying the holder and receiving the ticket: yet, where two have an interest in a ticket and one gives notice to the manager of his right or

partnership in half, while the other claims the whole, the manager may file interpleader.

Where T., a lottery ticket seller, (having had similar dealings with B.) agreed to sell B. a half of a ticket and the clerk of the former took it out of the drawer and B. marked on the back " J. B. one half," and the clerk wrote T.'s name underneath and put the ticket back into the drawer : *Held*, to be a sale and that B. was entitled to half the prize the ticket drew.

*Jan.* 31, 1837.

*Pleading.*
*Interplea-*
*der.*
*Lottery*
*Ticket.*

BILL, in the nature of interpleader.

The complainants, as managers of the Union Canal Lottery of Pennsylvania, issued the twelfth class of such lottery, and the defendant, Arthur O. Tisdale, who was a lottery ticket vender in the city of Boston, became possessed of a quarter. James Bartlett, another defendant, agreed with Tisdale, at his office in Boston, for one half of this quarter ticket and, as was usual with Bartlett when he bought tickets, endorsed upon it his initials and interest, thus, " J. B. one half." A clerk of Tisdale's wrote the name of the latter thereunder and then put the quarter ticket back into Tisdale's drawer. The lottery was drawn ; and this share entitled the owner of it to a quarter of a prize of thirty thousand dollars.

Tisdale had made various statements, in relation to the sale of this share, at the time the returns of the drawing reached Boston. Bartlett, finding that the ticket had come up a prize, called at Tisdale's office, where he was informed that the same had been again sold. On receiving this information, he left Boston ; and shortly thereafter he claimed, at the complainants' offices in New-York and Philadelphia, one half of the sum due on this quarter ticket ; and gave them notice not to pay it to any other person. He also inserted a caution in the newspapers.

Shortly after this, one Perkins presented the share at the office of the complainants in the city of New-York ; but they declined to pay, on the ground that Bartlett had made claim to half of it and because the time for payment had not expired.

The whole sum was afterwards demanded by some person in behalf of Tisdale.

The share was again presented at the office of the complainants in Philadelphia by Ezra Bourne, a lottery vender in that city ; and the complainants offered to pay to him, for the

person who gave him the share, one half and the other half for whoever was entitled to the same, provided he would, thereupon, deliver up the share to them. Bourne refused.

This share was twice presented by the defendant, Pettibone, at the complainants' office in New-York; and the whole amount was claimed by him. When he first applied, he represented himself to be a resident of Philadelphia, but, the second time, of New-York. Pettibone claimed under an assignment, made by Tisdale after the prize had become payable. He afterwards stated that he knew there was some difficulty about the share at the time he received the assignment. The complainants apprised him of adverse claims and referred him to Philadelphia. He again presented the share at the complainants' office in the latter city; and once more demanded the whole amount. They offered to pay him half and to give a receipt to the effect that they had the said share in their possession and would pay the remaining half to any person legally entitled thereto, if he, the said Pettibone, would deliver to them the said share, which he refused to do.

The defendant, Pettibone, commenced an action, in the superior court of the city of New-York, against the complainants, for the recovery of the sum drawn in favor of this quarter ticket.

The complainants then filed their bill, making Tisdale, Bartlett and Pettibone, parties. Answers were put in; and, instead of taking the usual course of practice applicable to a bill of interpleader, replications had been filed and proofs taken.

Mr. *Sherwood*, for the complainants.

Mr. *D. Lord Jr.*, for the defendants Pettibone and Tisdale.

Mr. *Sedgwick*, for the defendant Bartlett.

The Vice-Chancellor :—The cause has been fully heard on its merits. Such a hearing does not generally take place on a bill of interpleader, the propriety of filing which is disposed of in an earlier stage and in a more summary way, putting the defendants in a position to litigate their rights in, what

1837.

YATES
*v.*
TISDALE.

Jan. 22,
1838.

may be considered, a new and independent proceeding. However, it appears to be admissible practice for parties to pursue the course here taken; and the court can now dispose of the whole case and of the rights of all parties: *City Bank* v. *Bangs*, 2 Paige's C. R. 572; *Brymer* v. *Buchanan*, 1 Cox, 425; *Duke of Bolton* v. *Williams*, 4 Bro. C. C. 297.

It is only important to enquire, whether the complainants were right in filing their bill, as regards the allowance or disallowance of costs to them? If it were necessary for their protection, within the rules established in respect to the bringing of bills of this sort, then they are entitled to costs out of the fund in dispute; otherwise, not. The general rule upon the subject is, that where the complainant is in danger of being doubly vexed, as where one of the adverse claimants of the fund or property in hand has commenced a suit and the other threatens to do so, he may file his bill and ask the protection of a court of equity. Nor does it seem to be necessary that both parties should appear to have a legal demand for the same debt or duty adverse to each other; for, if the demand of one is of such a nature as to be sueable at law, and the claim of the other grows out of equitable considerations and is cognizable only in equity, still it may be proper to file a bill; at the same time bringing the money into court and the parties before it, in order that their conflicting claims may be adjusted: *Stevenson* v. *Anderson*, 2 Ves. & B. 412, and note there containing the case of *Martinius* v. *Helmuth*; also see *Bleecker* v. *Graham*, 2 Edw. Ch. R. 647.

It is very clear to my mind, that only one action at law could ever be sustained against the complainants for the money payable upon the prize ticket, and which is the subject of controversy between the defendants. The contract of the complainants, as managers of the lottery, with the purchasers of tickets or shares of tickets issued by them, to pay such prize or share of prize as should be drawn to the number of each particular ticket, is, with respect to the payment of the money, an indivisible contract, and they could not be compelled to pay in fractional parts. If the purchaser of a ticket or share of a ticket, issued by the managers, subdivides and sells out shares to others, he does not thereby create so many separate and distinct rights of action against the managers. The

law on this subject is well expressed by Mr. Justice Story in 5 Wheaton, 286, (*Mandeville* v. *Welsh.*) where he observes; " a creditor shall not be permitted to split up a single cause of action into many actions, without the assent of the debtor, since it may subject him to many embarrassments and responsibilities not contemplated in his original undertaking. He has a right to stand upon the singleness of his original contract, and to decline any legal or equitable assignments, by which it may be broken into fragments. When he undertakes to pay an integral sum to his creditor, it is no part of his contract that he will pay in fractions to any other person." And these principles were subsequently applied by the learned judge to the very case of a lottery ticket, which had been subdivided, and where a portion of the prize was claimed against the original contracting party : *Shankland* v. *The Corporation of Washington*, 5 Peters, 394, 395. And it is equally well settled, that, to enable the holder of a ticket to sustain an action for the prize money, he must be the lawful holder, one who has come into possession of it in virtue of some right of property, either special or general, and not by finding or other casualty : *McLaughlin* v. *Waite*, 5 Wend. 404. Since, therefore, there could be but one payment demanded of the complainants, and that one the payment of the entire sum, payable upon the quarter-ticket in question, and since but one action for the whole could be sustained against them, it would follow that payment made to the person entitled to bring the action, as sole plaintiff, would be good in law and a bar to any other action brought for the same debt or duty.

But, supposing Bartlett to be entitled to one half of the money, and Tisdale or Pettibone to be entitled to the other, (and it is only the half claimed by Bartlett that is in dispute) then Bartlett and Tisdale or Pettibone are joint creditors of the complainants, either in virtue of a co-partnership interest in the ticket or as tenants in common of the same ; and a payment of the whole to one and a release or acquittance from him would, in law, be a good discharge as to the other. So, if an action were brought in their joint names, as owners of the ticket, a release of the action by one would, in law, bind the other ; as one of several joint obligees or simple contract creditors may release the debt : Collyer on Part. 259, 379. It is

*1837.*

YATES
*v.*
TISDALE.

therefore said, that the complainants in this case might have exonerated themselves from any further liability in law, by paying over the whole amount of the prize to Pettibone, upon his receipt and a surrender of the ticket. But, although such may appear to be the case, yet, as Bartlett had already given notice of his claim and had forbidden the payment of any more than a moiety of the money to any person except himself, had the complainants, disregarding such notice, paid over the money to Pettibone, there might have been some pretext, at least, for Bartlett to come into a court of equity, and, alleging fraud and collusion, ask to have the payment so far rescinded and to have the complainant's account to him for one half of the money. Even if such a bill should not eventually be sustained, the present complainants were not bound to take upon themselves the hazard of it; nor were they obliged to rely upon any promise or covenant of indemnity, had any such been tendered to them. This appears to be the settled doctrine with respect to the right of filing a bill of interpleader. The case of *Canfield* v. *Morgan and Sterling*, Hopk. 224, furnishes a precedent for a bill of this sort, under circumstances very analogous; for there it might have been said that Sterling, having possession of the quarter-ticket which had drawn a prize, was entitled to maintain the suit which he had commenced at law for the recovery of the money, and that, if the complainant Canfield should pay it to him, he would not be liable in law to pay the portion over again which was claimed adversely by Morgan, but, as Morgan had given notice not to pay over the entire sum to Sterling, it was deemed a proper case for the bill filed by Canfield; and Chancellor Sandford held that he was entitled to his costs out of the fund.

I suppose, therefore, that the complainants in the present case must be allowed their costs, to be paid, in the first instance, out of the money in dispute.

The next question is one between the defendants, viz. to which of them does the money belong?

I cannot very well perceive how a doubt can be entertained upon the evidence of there having been a clear, positive and unconditional agreement between Tisdale and Bartlett for the sale and purchase of one half of the quarter ticket in question. According to the testimony of Morse, Tisdale's clerk, Bartlett

came into Tisdale's office, when the witness showed Bartlett the quarter ticket and proposed selling it to him; upon which Tisdale, who was present, remarked it was not for sale; that, being the only one left, he had calculated to keep it himself. The witness then dropped the ticket into the drawer again, upon which Bartlett importuned Tisdale to sell him one half of it, and, after some conversation, Tisdale agreed to sell him half of it. The witness then took the ticket from the drawer and held it on the counter for Bartlett to mark it with his initials, which he did by writing on the back of it, "J. B. one half." The witness then wrote Tisdale's name under Bartlett's initials, and put the ticket back into the drawer. Now, as it appears to me, here is sufficient evidence of a sale, and of a sale consummated, so far as was necessary under the circumstances, by a delivery such as to invest Bartlett with a legal title to one half. This ticket was placed before him for the purpose of being marked by him, in order to denote his ownership of one half; and, by writing his name in brief and specifying the extent of his purchase, to render the contract binding on him. This was tantamount to a delivery; and it was the only delivery the part sold was capable of, consistently with perfect security to the vendor for his interest and ownership in the one half that remained unsold. It is true, that nothing was said, at the time, about the price or terms of credit or payment; and it is contended that these are component parts of every contract of sale and are necessary before the contract can be considered complete; but these parts of a contract may certainly be supplied by the usage of trade and the manner in which parties have been accustomed to deal together. And it appears, from the testimony in this cause, that Bartlett had been accustomed to buy lottery tickets of Tisdale; and the course of their dealing was, that Bartlett would go into his office and mark tickets, as in this instance; which tickets were then laid aside, as belonging to him; and, when the drawing of the lottery was over, he would call and come to a settlement, Tisdale charging him with the prices of the tickets, which were always publicly and well understood, and giving him credit for prizes, which his tickets had drawn. This therefore, though not expressed, must be considered as

entering into the contract in question and must be taken, by implication, as a part of it.

Indeed, so far from Tisdale himself considering the sale an imperfect or incomplete one, it is proved, by several witnesses, that immediately on receiving intelligence that the ticket had drawn the prize of thirty thousand dollars, he declared to them that he held the quarter of such ticket and had sold one half of it to Bartlett; though, soon afterwards, he pretended that he did not hold the quarter of the fortunate ticket, and denied the sale of any part of it to Bartlett.

As between Tisdale and Bartlett, I think the evidence clearly establishes, that the latter is entitled to participate equally with the former in the prize. Then, as to Pettibone, who comes in as a purchaser under Tisdale : whatever may have been the consideration paid by Pettibone for his alleged purchase; about which the evidence is not very satisfactory, whether it was any thing more than one half of what was payable on the quarter ticket, or how much he has in fact paid for it, or whether his purchase is an absolute one or conditional with Tisdale, even if we suppose him to be the actual purchaser of the entire quarter ticket and for a valuable consideration, still he does not stand in the favorable light of a *bona fide* purchaser without notice of the claim of Bartlett, and can, therefore, claim no better rights than Tisdale himself possessed. Pettibone did not become the purchaser until after the money had become due from the managers and an ineffectual attempt was made by Tisdale and his agents to obtain payment of the full amount. Bartlett's "caution to the public" had been published in the newspapers of New-York and Philadelphia; and he had given notice of his claim to the managers. Under these circumstances, Pettibone is chargeable with notice; and whatever title or interest he has must be considered subordinate to that of Bartlett.

I must, therefore, decree the money in question to belong to Bartlett. He is also entitled to his costs of this suit against Pettibone to be taxed ; and whatever the fund is lessened by the payment of the complainants' costs, must also be reimbursed to Bartlett by Pettibone.