BUTLER, *per pro amie*, v. M. INS. COMPANY ET AL.

1. A purchase by a parent in the name of his child is *prima facie* an advancement, subject to be rebutted by evidence manifesting a different intention, which evidence may consist of the cotemporaneous acts, and declarations, of a parent.

2. A father subscribed for shares of stock in the name of several persons, and among the rest of his daughter, and executed his note, and a mortgage for the payment of the money for the stock, in a short time, and before the payments were due, the notes and mortgage were cancelled, and a firm, of which the father was a member, became bound for the instalments, and afterwards paid them. Held, first, that the mere subscription in the name of the daughter, did not invest her with a title to the stock, and that the subsequent assumption of the debt, and payment by the firm, with the father's assent, repelled the presumption that it was intended as an advancement to the daughter. Second, that the daughter was a mere trustee of the firm, which was the owner of the stock. Third, that an assignment of the stock by the guardian of the daughter, was a void act. Fourth, that the daughter had no such interest in the stock, as would pass to the assignee of her husband, he having become a bankrupt.

3. Although a company, on whose books a number of shares of its stock stood in the name of an infant, permitted a guardian of the infant to transfer it to the *cestui que trust*, the infant being a dry trustee of the stock, without any interest in it, legal or equitable, as it was merely doing what a court of equity, upon the application of the company by a bill of interpleader would have directed to be done, it will be supported against the infant, though done without authority in the first instance.

Appeal from the Mobile Chancery District. Before the Hon. A. Crenshaw, Chancellor.

THE bill was filed by the plaintiff in error, to recover of the Insurance company, fifty shares of its stock, and the accruing dividends, upon the allegations, that in January, 1834, Joshua B. Leavens, the father of complainant, subscribed and paid for fifty shares of the stock of the company, in her name, intending at the time, to make her an advancement ; and that afterwards, the company permitted her guardian, after her

98

father's death, fraudulently to convey them to one Samuel St. John, the company knowing the facts, &c.

The defence made by the Insurance Co. is, that the subscription in the name of the daughter, was not intended as an advancement to her, or to vest in her any interest in the stock. That the stock was the property of the firm of St. John & Leavens, and the payment for it, made, not from the individual funds of the father of complainant, but from the partnership funds of St. John & Leavens.

The full detail of the bill, answer and proof embodied in the opinion of the court renders unnecessary a further statement. The chancellor at the hearing, dismissed the bill; from which decree this appeal is prayed.

W. G. JONES, for appellant.

1. In January, 1834, Joshua B. Leavens purchased fifty shares of stock of the Merchants' Insurance Co. in the name of his infant daughter, the present complainant, and a certificate for the same was issued to her by the company. This was *prima facie* a gift or advancement to the daughter, and there was no resulting trust to the father. 2 Story's Eq. § 1202, 1204; Doe ex dem. Davis v. McKinney, 5 Ala. Rep. 719, and cases cited below.

2. J. B. Leavens, having died in 1835, and B. Leavens having been appointed guardian of the plaintiff, then a minor, the guardian, in January, 1836, without having obtained an order of court for the purpose, was allowed by the company to transfer this stock to S. St. John, jr. This the guardian had no authority to do, and the transfer was a mere nullity. The title of the plaintiff was not thereby divested. Clay's Dig. 223, § 13; Smith v. Ventris, 10 Peters, 161; Wier v. Davis, 4 Ala. Rep. 442; Dearman v. Dearman, 4 Ala. Rep. 521.

3. It is the duty of a corporation not to allow its stock to be transferred by one having no valid authority to do so. If it permit such an invalid transfer, the corporation is liable to the true owner. His title is not divested. He continues to be a stockholder, and is entitled to the dividends, and all the privileges of a stockholder. Equity alone can secure him

these rights. Ang. & A. on Cor. 451 ; Ashley v. Blackwell, 2 Ed. Ch. R. 299 ; Davis v. The Bank of England, 2 Bing. 393 ; 9 E. C. L. R. 444.

4. The purchase being made by the father, in the name of his child, the presumption of law is, that it was intended as an advancement. All the authorities show, that this is regarded as a very strong presumption, and one which requires very strong, coherent, and consistent evidence to rebut it. It cannot be repelled by light or trivial circumstances. Though cotemporaneous acts, or even cotemporaneous declarations may be admissible to overthrow this presumption, and establish a trust in favor of the father, yet subsequent acts or declarations of the father, are not admissible for that purpose. 2 Story's Eq. § 1203, 1204; Finch v. Finch, 12 Ves. jr. 50 ; Mirass v. Franklin, 1 Swanst. 13, 19 ; Crabb v. Crabb, 1 Mylne & K. 511, 7 Cond. E. C. R. 146 ; Kilpin v. Kilpin, 1 Mylne & K. 550, 7 Cond. E. C. R. 150 ; Sydmouth v. Sydmouth, 2 Beavan, 447, 17 Cond. E. C. R. 447 ; Julian v. Reynolds, 8 Ala. R. 680.

5. The chancellor then should have excluded all the evidence of the subsequent acts and declarations of J. B. Leavens, and then clearly there was no sufficient evidence to rebut the presumption that it was intended as an advancement. But even if such evidence be admissible, still we insist that upon a careful examination of all the facts and circumstances in proof in this case ; the weight of evidence is in favor of the legal presumption that J. B. Leavens intended this purchase, at the time it was made, as an advancement to his daughter. The three witnesses examined by the defendant, stand in such a relation to this transaction, and testify in such a manner as to show that they are strongly biassed against the plaintiff's claim, and their evidence should be received with suspicion. B. Leavens, one of the witnesses, was the very guardian who made the illegal, and, as we contend, fraudulent transfer. He had had a long litigation with the plaintiff, and he had a direct pecuniary interest in having this stock treated as the property of J. B. Leavens' estate. N. St. John was the agent, confidential clerk, and near relative of S. St. John, to whom the illegal transfer was made. Bullard was also the custodian of the books, in which entries

were made about this stock, after the death of J. B. Leavens, and besides, his testimony is contradicted in some points by the testimony of numerous other witnesses. But giving to the evidence of these three witnesses, not only all the weight to which it is entitled, but all to which the most impartial and disinterested witnesses would be entitled, it relates almost exclusively to the subsequent acts and declarations of J. B. Leavens, and comes far short of proving that it was not the intention of J. B. L. at the time the stock was taken, (and the inquiry must be confined to his intention at that time,) to make an advancement to his daughter.

6. It is insisted that this stock was paid for by Joshua B. Leavens, out of funds of the firm of St. J. & L. We deny that the evidence shows this, and insist that it proves the contrary. But suppose he did draw money from the firm to pay for it, or to complete the payment for it. He was a partner, and had a right to do this. He should have been, and if he drew it, probably was, charged with it, in the books of the firm. It is not pretended any creditor or partner was thereby injured, or that any fraud was intended. He may have been, and probably was then, a creditor of the firm, but if he was not, he in his lifetime, and his estate after his death, was amply able to make good any balance he might owe the firm. Then even if the fact be, (which we by no means admit,) that the stock was paid for, wholly or in part, out of monies drawn from the firm, it cannot affect the plaintiff's right and title to the stock at law or in equity.

7. If it can be shown, or has been shown, that there was a resulting trust, either for J. B. Leavens, or the firm of St. John & Leavens, as to this stock, this is no defence to the Insurance Company. That company can only look to the legal title to its stock, as shown by its books and certificates. It cannot raise and execute a resulting trust, or inquire into the supposed equities between different claimants. Its character does not vest in it the powers and jurisdiction of a court of equity, so far as I can discover. If the plaintiff is a trustee of this stock, that is no reason why the company should deprive her of it, but the contrary. Words on Joint Stock Co. 303, 30 Law Lib.

J. A. CAMPBELL, contra.

1. The evidence shows, that the subscriptions for stock made by J. B. Leavens, at the opening of the books of the corporation were made on account of the firm of St. John & Leavens, and that the whole subscription was paid for with the money of the firm. This evidence repels the presumption that he designed to advance his daughter by this subscription. The basis of this presumption, is a moral obligation on the part of the father to advance his child. That obligation cannot be fulfilled at the expense of third persons. Story's Eq. 1203, 1204.

2. The subscriptions made by the father of the complainant, in the name of third persons, but on account of the firm, and at its expense, created a trust for the firm. That trust cannot be repelled by proof that the person whose name was used, was a connection for whom the partner was bound to provide. 2 Story's Eq. 1206; 3 Bibb, 506; 2 Wash. C. C. 441; 3 M. & S. 562; 1 John. Ch. R. 467.

3. The Merchants' Insurance Co. is entitled to have Saml. St. John and Benj. Leavens before the court, and to assert their titles against the complainant. A court of equity will not permit a trustee, with a naked legal title, to interfere with the *cestui que trust*, or disturb him or his assigns in the enjoyment of the property. This suit could not be maintained by the assignee, (Harris.) Willis on Trustees, 171-2, 10 Law Lib.; 5 Sim. 555; 3 Russ. 583; Hill on Trustees, 316.

4. Mrs. Butler, as the legatee of her father, has received a much larger share of property from her father than this stock comes to. The father, contemporaneously with the execution of his will, directs the transfer of this stock to his partner, as belonging to him, and as having been paid for by him. Conceding then that Mrs. Butler had any claim upon this stock, her legacy must be held as a satisfaction of her claim upon her father's estate. 2 Roper Leg. 38; 2 Lomax Ex. 98.

5. The guardian has the power to transfer the property of his ward, under the circumstances of this case. The case was not a sale, and therefore it does not fall under the prohibition in the statute. Clay's Dig. 223, § 13. That statute

regulates the forms and modes of sale. This case is the transfer to St. John of property belonging to him in the hands of a guardian. It is the concession of a right which belongs to him, and without exposing him to a law suit. The court of chancery would have directed the guardian to account for the dividends, and to transfer the stock, and having fulfilled this duty, the court of chancery will uphold it. 7 John. Ch. R. 150; 6 Paige, 95; 6 Watk. Leigh. Rep. 399; 2 Pick. 243; 1 Atk. 480; 2 J. & W. 243; Fletcher on Trustees above cited, 171-2.

6. The suit being brought by Mrs. Butler, upon her equitable right, all equitable considerations may be set up to defeat that right. If she had a legal title, an equity superior to her own, would be admitted to repel it. It is only when equities are equal, that the law is allowed to prevail. In this case, if the guardian had no authority to convey, the legal title is in the assignee, as was settled in 8 Ala. Rep. 146; 3 Ves. 617.

7. That the evidence of an intent to advance is conclusively repelled—1. By proof of the circumstances under which the stock was taken. That it was taken under no fixed purpose to hold the stock, but with the declared purpose not to retain it. 2. By the fact that no money of the subscriber was used to pay for the subscriptions. 3. By the fact that the money of another was used. 4. That no beneficial use of the property was ever made by the father, (individually,) or by the child, or for the child. 5. By the fact that this stock was used, and treated in the same manner as other subscriptions made at the same time; and that this stock was all held as belonging to the firm, which had advanced the money. 6. By the conduct of the complainant and her husband, in the settlement of the guardianship account, and the affairs of the firm of St. John & Leavens. 1 Young & Call, 65; 1 Sim. & S. 1; 4 Serg. & R. 329; 1 Swanst. 13; 8 East, 324; 10 Ala. 900; 11 John. 91; 1 Beaven, 554.

8. The evidence here is admissible, because it connects itself with the first subscription, and shows from the beginning,

how this stock had been employed; in whose possession it was held, and by whom it was enjoyed. The authorities go rather upon the sufficiency of the evidence than upon its competency. The receipt of dividends—the use of the property purchased by a father in the name of the child, is still consistent with the notion of an advancement, especially in the case of an infant. But in this case, the father does not, either as guardian for his daughter, or in his own name, receive the dividends, but it is held adversely to both of those rights by other persons. 1 Har. & J. 86; 1 Young & C. 65; Greenl. Ev. 108-9; Hill & C. Notes, 645, 660-1; 8 Ala. R. 652. Courts of chancery receive this evidence in parallel cases. 2 Russ. & M. 251, 310; 7 Vesey, 507; 2 Johns. Ch. R. 409.

CHILTON, J.—The plaintiff, who is the wife of Thomas J. Butler, and daughter of the late Joshua B. Leavens, filed her bill in chancery against the appellees, alledging that in January, 1834, her father, being a man of large fortune, which greatly exceeded his debts and liabilities, &c. bought in her name and paid for the same, fifty shares of the capital stock of the Merchants' Insurance Company of the city of Mobile, which company had been duly incorporated by an act of the legislature of the State of Alabama. That the certificate of stock was duly issued for said fifty shares to complainant, and the same were entered upon the books of said corporation as belonging to her, as will appear by the books of said corporation. Tha her father, at the same time, purchased in his own name one hundred shares of said stock. That the stock so purchased in her name was designed by her said father as an advancement. That in June thereafter, Joshua B. Leavens departed this life, leaving the complainant his only child, she being an infant, and leaving a large estate greatly more than sufficient to pay all his debts. After the death of Joshua, Benjamin Leavens was appointed guardian for the complainant by the orphans' court of Mobile county. That her said guardian, in January, 1836, pending her minority, and without any order from the orphans' court. of Mobile, or authority whatever, fraudulently and improperly

caused the said fifty shares of stock to be transferred on the books of the said company, to Samuel St. John, jr. and delivered said certificate of stock up to the company to be canceled or destroyed. That the officers of the company, and the other parties to the said transfer, were fully apprised of complainant's right to the stock, and said transfer was made on the books of the corporation in violation of the by-laws of the same, regulating the transfers of stock. A new certificate for said fifty shares was then issued by the corporation to said Samuel St. John, jr. by which means, complainant has been deprived of the benefit of said stock, and the dividends accruing thereupon. In December, 1837, not then having attained the age of majority, she intermarried with defendant, Butler. That on the 19th January, 1839, and repeatedly thereafter, she and her said husband demanded the certificate of stock of said fifty shares, and the dividends thereon, but the corporation has, since the month of January, 1836, refused to recognize her as a stockholder, and likewise refused to regard her said husband as having any right to said stock. That the shares are worth $100 each, and large dividends have been declared semi-annually since the year 1836, as will appear by the books of the corporation. That on the 8th December, 1842, her said husband, by deed of that date duly executed, declared his intention not to reduce said stock and dividends into his possession, but transferred and released the same to complainant, to have and hold to her sole and separate use, free from any interest or control which he might otherwise assert by virtue of his marriage. That she afterwards demanded the dividends, &c. of the corporation, but was refused.

On the 2d May, 1843, her husband was discharged by decree in bankruptcy, upon his petition filed in the district court holden at Mobile on the 14th December, 1842, by which decree in bankruptcy, his estate became vested in P. T. Harris, the general assignee in bankruptcy for said district court, in that behalf duly appointed. The said assignee and Thomas J. Butler, and the Merchants' Insurance Company, are made defendants to the bill. Complainant prays that the transfer made by her guardian, and the certificate issued to S. St. John, jr. may be declared void. That the deed from

her husband to her may be established—that she may be declared entitled to the fifty shares of stock, and that some suitable person be appointed trustee to receive, and have an account of the dividends for her use, &c.

A copy of the deed from said Butler to the complainant, is attached to the bill as an exhibit.

The bill was taken for confessed as against Butler, and Harris, the assignee in bankruptcy. The Merchants' Insurance Company answered, and denied that the fifty shares were bought and paid for by J. B. Leavens as an advancement to the complainant, but on the contrary, avers that in 1834, about the time stated in the bill, the mercantile firm of St. John & Leavens, late composed of said Joshua B. Leavens and Samuel St. John, and the firm of J. D. Beers & Co. of New York, subscribed for two hundred and eighty shares of the capital stock in said company. That the said stock was subscribed for in the names of several persons, by J. B. Leavens, viz., a portion in his own name, fifty shares in the name of his daughter, the complainant, and the remainder in different portions in the names of S. St. John, George Starr, and St. John & Leavens. The answer further states, that the entries on the books of St. John & Leavens, made in the lifetime of Leavens, and while he was the active member of the firm, show that the stock was purchased for the benefit of the firm, and that the expenditures on account of its purchase, were incurred by said firm. Admits the death of J. B. Leavens, the appointment of Benjamin Leavens as guardian for the complainant, and insists that as such guardian, under the circumstances of the case, and in accordance with the request of Joshua B., his brother, before his death, he did make, and had the right to make the transfer of the stock, which had been entered on the books of the company in the name of complainant. That at the time said transfer was made of said stock to Samuel St. John, the company was not apprised of the considerations and inducements which led to the same, but has subsequently learned that said transfer was made in accordance with the previous request of Joshua B. Leavens. That no money was paid by Samuel St. John, but he was charged on the books of the firm of St. John &

99

Leavens with the par value of the stock. That in the settlement of the affairs of said firm, Joshua fell largely in debt to it, say $100,000, and that the members of the firm claimed that he owed them $100,000, in addition to the firm demand.

That in 1841, a settlement was made between Benjamin Leavens, executor of Joshua B. Leavens, deceased, and J. D. Beers, who had before that time become the assignee of all the interest of the other partners, and represented them. The parties disagreeing as to the settlement, a suit was instituted in the circuit court of the United States for the southern district of Alabama, for the settlement of the partnership accounts, and the adjustment of all matters of difference between them. That in this controversy, although the fifty shares were credited to Joshua B. Leavens and charged to Samuel St. John, jr., the complainant made no objection thereto. That the whole matter was finally settled by an assignment to J. D. Beers, of the effects of the firm of St. John & Leavens, said partners, and Benjamin Leavens, as executor of Joshua B., executing mutual releases as to claims in favor or against the estate of said Joshua. That by this arrangement, the estate of Joshua was greatly benefited, and the complainant was represented in the settlement by her husband, who gave his consent to the arrangement, which was concluded at Mobile in the spring of 1841, and when both complainant and her said husband had arrived at the age of twenty-one years.

The answer further avers, that allowing the said Benjamin Leavens transcended his authority as executor of Joshua B. and guardian for complainant, still she should not be heard to complain, as she has received from her said father's estate $30,000, and is thereby fully indemnified for the loss. Admits the marriage, and bankruptcy of Butler, as charged. Requires proof of the release of said Butler to his wife of his interest in the shares in controversy, and denies that any demand was made of the shares or dividends by the complainant or her husband, before the 11th January, 1843, when she ordered the company by letter to make payment to one Starke. Previous to that time, the defendant knows of no letters which passed, or conversations had with the plaintiff

or her husband respecting said shares. That Samuel St. John has transferred the stock for which the company had issued a certificate to him, upon the cancellation of the certificate previously given in the name of complainant, and the same was then owned by H. Baldwin, G. F. Simmons, J. G. Whitaker and N. S. Powers; the last transfer by St. John having been made in the year 1841.

The answer further insists, that the guardianship of Benjamin Leavens has been fully settled by the orphans' court of Mobile. That the complainant and her husband were parties to that settlement, and made no claim against their said guardian for said shares, but fell in his debt. Avers further, that complainant and her husband have released the securities of Benjamin Leavens on his bond as executor of Joshua B., and as guardian for the complainant, thereby indicating that they well knew the fifty shares of stock were not designed as an advancement, but that the name of the complainant was used for a temporary purpose, which having been subserved, the stock was transferred, as it should have been, to the firm whose means had paid for it. This defendant demurs to the bill for want of proper parties, and insists also upon the plea of the statute of limitations of six years. Upon the hearing, on bill, answer and proof, &c. the chancellor dismissed the bill.

The view we take of the merits of this controversy, renders it unnecessary for us to examine the questions raised upon the demurrer to the bill.

The main question is, does the record show that the fifty shares subscribed for by Joshua B. Leavens in the Merchants' Insurance Company, in the name of Helen Naomi Leavens, now Mrs. Butler, were designed as an advancement to her; and if so designed, whether the gift or advancement was so perfected by her said father, as under the circumstances in proof, the court would be warranted in decreeing to her the benefit of the stock. The rule of the common law was, that where a feoffment was made without consideration, the use resulted to the feoffor, and upon this the doctrine of implied or resulting trusts in respect to real estate has been engrafted, which has been extended to embrace the purchase of securities in the name of a third person.

Judge Story says, the rule has in its origin the natural presumption, in the absence of all rebutting circumstances, that he who supplies the money to effect the purchase, intends the purchase for his own benefit, rather than for that of another; and that the conveyance in the name of the latter, is a matter of convenience and arrangement between the parties, for other collateral purposes. 2 Story's Eq. Juris. § 1200. This presumption of a trust, however, may be, and is rebutted in cases where it may be fairly inferred the purchase was made in the name of another, from considerations of natural love and affection. Thus, it is laid down generally in the books, that if a parent purchase in the name of his son, it will be deemed *prima facie* an advancement, so as to rebut the presumption of a trust resulting in favor of the parent. Jeremy's Eq. Juris. 88, 90; 2 Story's Eq. Juris. § 1202, 1203, and authorities there cited; Doe ex dem. Davis v. McKinney et al. 5 Ala. Rep. 719, 727; Heirs of Wilks v. Wilks's adm'r, *supra*, and cases there cited.

We have said a purchase by a parent, in the name of his child, is *prima facie* an advancement, it results, that the relation of parent and child, being only evidence of the intention with which the purchase was made, creating a presumption in favor of the child, such presumption may be rebutted by evidence manifesting a different intention. This evidence may consist in the cotemporaneous acts and declarations of the parent. The authorities referred to, as holding that parol proof shall not be admitted in such cases to establish a resulting trust in favor of the father, or third persons, do not, we conceive, sustain the position as applicable to this case. Mr. Atherly holds, there are circumstances which will rebut the presumption of an advancement, and which will convert the child into a trustee. Among such, he notes a previous ample provision for the child by the parent. Ath. Mar. Set. 477. And also in cases where he has no provision; yet if the subject of the purchase is the only property out of which the parent can make a provision for the other branches of his family, a court of equity would probably consider the child a trustee; for being equally bound morally to provide for all his children, the court will intend the parent contemplated the fulfilment of that moral duty; and not that

he intended to give all his property to one child. Again: he thinks the presumption of an advancement is rebutted, where a necessity is shown to exist for taking the purchase in the child's name, as in the case of a grant of *copyholds for lives successive.* Ib. 478. Several of the English cases referred to, arise under their construction of the statute of frauds. Such was the case of Leman v. Whitley, 4 Russ. 423, (3 Cond. Eng. Ch. Rep. 736,) in which a son conveyed an estate to his father nominally as purchaser, but really as trustee, to mortgage it for the purpose of raising money for the benefit of the son. The consideration expressed in the deed of release was £400. The father, without having executed any mortgage, died, having devised all his real estate. The question came up whether the court could declare the father a trustee for the son. The Master of the Rolls held that as there was no evidence in writing inconsistent with the fact that the father was the actual purchaser of the estate, to imply a trust in behalf of the son, would be in effect to repeal the statute of frauds, but, as the purchase money had not been paid, he decreed a lien on the estate for its payment. In that case, the son was endeavoring to raise a trust in contradistinction to the terms of his deed, without alledging fraud or mistake in his conveyance.

It is, however, unnecessary for us to comment upon the various cases to which we are referred as to the conclusiveness of the presumption of an advancement, where the father makes the purchase in the name of his child, and advances the consideration, or where he conveys directly to the child. The case at bar, in our opinion, is by the testimony placed without the influence of these decisions.

The bill in the case before us alledges, that the purchase of the fifty shares of stock in controversy was made in the name of Miss Leavens, (now Mrs. Butler,) and which shares were paid for by her father. The answer denies that the father paid for them, but on the contrary, asserts the payment was made by the firm of St. John & Leavens. Thus, an issue is presented. Let us turn to the evidence.

The proof on the part of the complainant, shows, that Joshua B. Leavens subscribed for the fifty shares in January, 1834, in the name of his daughter, who then lacked a few

months of being thirteen years of age. A transcript of the entries from the books of the Merchants' Insurance Company is produced, by which it appears, that Helen N. Leavens is credited by cash for fifty shares, (January, 1834,) $5,000. A mortgage is also produced, of even date with this credit, executed by Joshua B. Leavens to the company, to secure the payment of a note then executed for $22,400. On this mortgage was the indorsement of cancellation by the payment of the money thereby secured, dated 28th April, 1835, and signed by the secretary of the company. By the entry on the books of the company, it appears, that the stock in the name of complainant, was transferred by her guardian, Benjamin Leavens, in January, 1836, to Samuel St. John, at par.

Complainant further proved by five witnesses, that Joshua B. Leavens, at the time of the purchase in the name of his daughter, was a man in high standing—considered wealthy —was a member of the firm of St. John & Leavens—handled large amounts of money—was the owner of much real estate in the city of Mobile. That he purchased of one of the witnesses (Gordon) in May, 1832, real estate in Mobile, amounting to $100,000; and afterwards, a short time before he died, the same was sold by him for $200,000, all which has been paid, except some $40,000 or $50,000. It is further shown, that the rules of the company required twenty per cent. of the stock subscription to be paid in cash, at the time of subscribing.

The defendant examined these witnesses. The first, *Benjamin Leavens*, testifies as to declarations made by his brother Joshua a short time before his death, in respect to the shares which he held in the Merchants' Insurance Company; viz., that Joshua informed him, that the purchase of said stock had been made for the benefit of the firm of St. John & Leavens; that their funds had paid for said stock, and that he was instructed by Joshua, to transfer said stock to the firm, or to St. John, as the latter might direct. Said Joshua being then about starting to the north, and giving the witness instructions as his agent, and executor of his will in anticipation of his death.

The deposition of *Newton St. John*, is very full and expli-

cit in respect to the subscription for the stock—the reasons for subscribing in the name of the complainant, and also as to the manner in which the payment was made. He proves, that at the time of the subscribing for said shares, he was the confidential clerk of St. John & Leavens. That St. John resided in the north; that J. D. Beers & Co. were also partners in the concern, who carried on business in New York. Leavens was the active business man of the firm in Mobile.

This witness further proves, that in 1833, the legislature having chartered the Merchants' Insurance Company, Joseph E. Sheffield, and Joshua B. Leavens, both being the owners of much real estate, and interested in the prosperity of the city, the former insisted that Leavens should aid in starting, or "*launching*" the company, believing that when started, it would be of much public advantage. That after repeated conversations, it was finally concluded, that both Sheffield and Leavens, should each take a large portion of the stock, and that the company might present the appearance of having its stock distributed among a great many persons, they used in their subscription the names of numbers of their friends. That Sheffield subscribed for more stock than Leavens, and used more names than he. Among the names used by Leavens, was that of his daughter, the complainant. That the mortgage executed by Leavens, as also the note which it was intended to secure, were but temporary arrangements, designed to postpone the cash payments; and in a short time thereafter, were taken up, and a new arrangement made, by which the firm of St. John & Leavens became bound for the stock. That on the 29th day of March, 1834, the witness, at the request of Leavens, made an entry upon the books of St. John & Leavens, placing the shares so purchased, (being two hundred and eighty,) to the credit of the firm. He also testifies, that the entire stock was paid for out of the funds of St. John & Leavens, and that the latter never paid any thing therefor, from his private funds, but purchased said stock for the firm.

Another witness, (Bullard,) exhibits copies from the books of St. John & Leavens, of the account between the firm and the company, showing that money was advanced by the firm, and the sums and dates.

We are compelled by the force of the testimony of Newton St. John, to say nothing of the other portions of the evidence, much of which is objected to, and some of which is of doubtful admissibility, to arrive at the conclusion, that the fifty shares in controversy, were paid for by the firm of St. John & Leavens. This witness is unimpeached. He has no interest in the subject matter of the controversy; his evidence is consistent with itself, and is not opposed by the other testimony in the case. Besides, he certainly had better means of knowing all about the transaction to which he deposes, than any one else, being at the time the intimate friend of Leavens, and confidential clerk of the firm. His testimony also is corroborated by the testimony of Bullard, and Benjamin Leavens, and by the books of the firm, and as to the pecuniary condition of Joshua B. Leavens, viz., that he was prospectively a man of fortune at the time the stock was taken, dependent upon fortunate dispositions of his real estate, for the payment of his debts, &c. this witness is certainly sustained by the records showing the amount of his estate, and which clearly show, that but for the profits made upon the sale of the lots purchased by Leavens of Gordon, and sold a short time before his death to Emanuel & Gaines, his estate would have been largely insolvent.

Had Joshua B. Leavens purchased this stock in the name of his daughter, with his own funds, we should not hesitate, in the absence of cotemporaneous circumstances, showing a different intention, to regard the purchase as an advancement. She was his only child—an infant daughter, and he was a widower. His pecuniary circumstances perhaps would have justified such a provision for her. Her tender years, as well as her situation otherwise, would seem to furnish a very strong argument against any supposed intention on the part of her father, to make her a trustee. Taylor v. Taylor, 1 Atk. 386. But these circumstances, though strong, must yield to the proof in the cause.

"The moral obligation," says Judge Story, "of a parent to provide for his children, is the foundation of this exception, or rather this rebutter of the presumption," that the purchase in the name of the child was intended for the father's benefit: the presumption of an advancement should

not therefore be frittered away by nice refinements.   2 Sto. Eq. Jur. § 1203; Hill on Trustees, 103; per Lord Eldon, Finch v. Finch, 15 Vesey, 50.   Now, as the moral obligation of the parent lies at the foundation of this presumption, that the purchase was designed as an advancement, it would seem necessarily to follow, that equity would never raise such presumption, when by so doing the parent would be involved in a breach of moral duty.   So it has been repeatedly held, that where the child has been fully provided for, a purchase subsequently in his name, will not be considered as an advancement, especially where the effect of such purchase, if so considered, would be to deprive other children of any portion of the father's estate.   Pole v. Pole, 1 Ves. 76; Ath. on Mar. Set. 477; Hill on Trustees, 103, 104, and authorities cited on the last page.   This would be to intend, the father was wanting in his duty to his other children, for whom he was equally bound to provide.   So, in the case before us, there could arise no moral duty to advance the child out of the funds of the firm of St. John & Leavens.   And to raise the presumption of an advancement under such circumstances, would be to presume the parent wanting in good faith to the members of his firm, whose funds he had improperly withdrawn from the business in which they were invested, that he might give them to his child.   The claims of benevolence must yield to the sterner demands of justice.

In the modern case of Sydmouth v. Sydmouth, 2 Bevan, 447, Lord Langdale, Master of the Rolls, thus states the law: "Where property is purchased by a parent in the name of his child, the purchase is *prima facie* to be deemed an advancement; the resulting, or implied trust, which arises in favor of the person who pays the purchase money, and takes a conveyance, or transfer, in the name of a stranger, does not arise in the case of a purchase by a parent in the name of his child. But still, the relation of parent and child is only *evidence of the intention* of the parent to advance the child, and that evidence may be rebutted by other evidence, manifesting an intention that the child shall take as trustee."   The case further decides, that cotemporaneous acts, and declarations of the father, are evidence to rebut the *prima facie* intendment.

100

The usual inquiry is, whether the parent intended the purchase as an advance, and the burthen of proof is cast upon the party claiming in opposition to the child. It is said, that subsequent acts and declarations of a parent are not evidence to support the trust, and that we must look to what was said and done *at the time.* This, as a general rule, is doubtless correct, as applied to those cases in which the title becomes perfect by the conveyance, and nothing remains to be done by the father to vest the absolute interest in the child ; for if the estate becomes once vested as a gift, or advancement by the parent, and nothing remains to be done to render it complete, most certainly no subsequent act, or declaration of his, could divest or defeat it. Skeats v. Skeats, 2 Young & Col. C. C. 9; Back v. Andrew, 2 Vern. 120 ; Dyer v. Dyer, 2 Cox, 92; Murless v. Franklin, 1 Swans. 13 ; Finch v. Finch, 15 Vesey, 51; Sydmouth v. Sydmouth, *sup.;* Crabb v. Crabb, 1 Myl. & K. 519.

In the case at bar, the parent subscribed for two hundred and eighty shares of stock, using the names of various persons, and executed his note, and mortgage, to secure the payment, and which, in a short time, and before any payment was made thereon, were canceled, and the firm of which he was a member became bound for the instalments. What title, it may be asked, did the complainant acquire by the bare act of her father's subscribing for the stock ? Could he not have refused the payment and forfeited the stock ? Could he not, holding the certificate, have canceled the arrangement, and returned the certificate to the company ? Would the court of chancery, upon the application of the daughter, have compelled the father to have paid for the shares for her benefit ? I apprehend the rule is well settled, that a *valuable* consideration is required to put that court in motion. Holloway v. Headington, 8 Sim. 324.; Hill on Trustees, 83; Cecil v. Butcher, 2 J. & W. 565 ; Cook v. Fountain, 3 Swans. 591. The mere act of subscribing, does not constitute the advancement, but the outlay of the money, or funds of the father, which was necessary to vest the beneficial interest in the securities in the daughter. It follows, then, if this view be correct, the acts and declarations of the father cotemporaneous with the payment, and while he held the certificate of

the shares, constitute a part of the *res gestae*, and were consequently admissible as evidence.    In Scarvin v. Scarvin, 1 Yo. & Coll. C. C. 65, Sir J. L. Knight Bruce, V. C., held, upon the authority of Merless v. Franklin, 1 Swans. 13, that the receipt of the dividends by the father, of stock purchased by him in the name of his son, was a circumstance in favor of the father, though not conclusive.

In that case, the father had subscribed one hundred shares in his own name, and fifty in the name of his son.    The certificates were retained by the father, who also paid up the various calls upon all the shares, and received the dividends, but without any order from the son.    There was evidence on the part of the father, that the son had said the shares belonged to the father; but it was also shown the son offered to sell the shares as his own, and that it was the intention of the father to bequeath them, with the rest of his property. The vice chancellor was of the opinion, that the receipt of the title deeds, and dividends, was evidence for the father, especially in case of an adult, *and that the payment of the calls upon the stock subsequent to the subscription, carried the case further, than the mere payment of the price at the time of the purchase would have done.*

I am not unapprised of the decisions which affirm, that where the nominee is an infant, the father, as to the perception of the profits of the investment, and the retention of the title deeds, must be regarded as acting in his capacity of guardian, although Lord Ch. Justice Eyre, in Dyer v. Dyer, 2 Cox. Rep. 92, thought it would' be very difficult to succeed in a bill for an account against him as such.    Nevertheless, these authorities, in my judgment, do not apply to cases where the equitable, or beneficial interest has never vested in the nominee; and they are certainly inapplicable to the present case, in which the receipt of the dividends was not by the father *individually*, but by the firm, who advanced the money.    The main fact to be ascertained is, did the father *intend* to advance the daughter?   Did he intend to invest in this stock $5,000 for her benefit?    Now, the payment for the shares, their retention by Joshua B. Leavens for the firm, and the receipt of the dividends by the firm, are all circumstances which either form a part of, or connect them-

selves with the principal, or main fact, and are calculated to illustrate its character, and show the intention with which it was done.   The payments for the stock, should be regarded as forming parts of a continuous transaction, and the cotemporaneous declarations of Joshua B. Leavens, who is shown to have been in possession of the certificates of stock at the time they were made, as to the character in which he held it, must be regarded as parts of the *res gestae.*   1 Greenl. Ev. 123, 126, § 108, 109, 110.; Jackson v. Matsdorph, 11 Johns. Rep. 91; 2 Phil. Ev. C. & H.'s Notes, 644, note 481; Donnell v. Thompson, 13 Ala. Rep. 440; McBride et ux. v. Thompson, 8 Ala. Rep. 650.   Taking into consideration the facts which may be brought within the rules of evidence, as above laid down, we come to the conclusion, that it was not the intention of Joshua B. Leavens to advance his daughter in the purchase of this stock.   The manner of the purchase, having at the same time used the names of various other individuals—the object for thus using their names, giving the stock the appearance of a large distribution, so as to increase public confidence in the institution—the fact that he paid no money, but used the money of a third party, his firm—the declaration of a trust a short time after the subscription on the books of the firm for *all* the stock—the receipt of the dividends by the firm, and the exercise of all acts indicating the ownership by the firm of which the subject matter would admit;—all these satisfy us the subscription was not an advancement to Miss Leavens, but that she held the legal title for the firm of St. John & Leavens.

2. But it is insisted that Mrs. Butler must be considered as having the legal title, and though she may hold as trustee, still she is entitled to the relief sought by the bill.

Whether she holds the legal title, depends—1. Upon the validity of the assignment by her guardian of these shares to Samuel St. John.   2. Upon the effect of her husband's bankruptcy, in operating a transfer to his assignee.

1. By the first section of the act of 1809, Clay's Dig. 228, § 13, it is made unlawful for any executor, guardian, &c. to take the estate of any testator or intestate at the appraised value, or to dispose of the same at private sale, except where the same is directed by the will of the testator.   It is further

provided by statute, "if the personal estate, and rents and profits of the real estate, are insufficient to support the ward, &c. the orphans' court, upon full investigation, may order a sale of his lands, tenements, &c.   Clay's Dig. 268. § 6.   In Smith v. Ventress, 10 Peters, 161, and Wier v. Davis, 4 Ala. Rep. 442, as also Dearman v. Dearman & Coffman, Ib. 521, it was decided, that under the provision first cited from the statutes, a private sale of slaves, made by an administrator, without an order of the orphans' court, passed no title.   And it is equally clear, that a guardian cannot sell the personal property of his ward at private sale.   In Field v. Schieffelin, 7 Johns. Ch. Rep. 154, it is said, "though it be not in the ordinary course of the guardian's administration to sell the personal property of his ward, yet he has the legal right to do it, for it is entirely under his control and management, and he is not obliged to apply to the court for direction in every particular case."   So, in that case, the court sustained the assignment of the bond and mortgage by the guardian, there being no fraud, or collusion between the guardian and purchaser.   This case, as well as the authority in 2 Pick. Rep. 243, and 6 Leigh's Rep. 399, deduces the validity of the guardian's act, from his general power to dispose of the ward's personal estate, but in this State the power to dispose of the property by private sale is taken away by statute, and these authorities become inapplicable.   If we grant that this stock vested beneficially in the ward, so as to give the guardian power over it, in virtue of his fiduciary relation, then it is a portion of the ward's personal estate, which may not be sold or disposed of at private sale.   On the other hand, if the complainant had no beneficial interest in the stock, but was a mere dry trustee, holding the legal title, as we have determined she did, for the benefit of the firm of St. John & Leavens, then the guardian had no power over the title.   The rule of the common law was, that an infant trustee could not make a valid disposition of the trust estate, and a court of chancery could not decree such trustee to convey the legal estate until enabled by statute.   This doctrine of the common law, which was more particularly applicable to suits respecting real estate, and which was adopted by courts of chancery in analogous cases, was founded in the right of the infant to

have the *parol demur*, until he attained the age of majority. The decree therefore in behalf of the *cestui que trust*, was, that he should hold and enjoy against the infant, who should convey when he came of age. Lechmere v. Brashier, 2 Jac. & W. 290; Daniel, 1, 222; Spence's Eq. Juris. 616. But with us, the decree passes, and the infant is given day after he arrives at age, to show cause against it. The guardian not having power, as we have seen, to dispose of the stock, even though it had belonged to his ward, *a fortiori* he cannot dispose of it, when it cannot be considered as effects of the ward in his hands, but when in fact the beneficial interest is in another.

2. Regarding Mrs. Butler as a mere trustee, it is perfectly clear that no title to the shares passed by the decree in bankruptcy to the assignee. According to the construction put upon the bankrupt acts, trust property does not vest in the assignees, but remains in the bankrupt, unaffected by the decree. Hill on Trustees, 51; Gladstone et al. v. Gill et al. 1 M. & S. 517; Scott v. Surman, Willes' Rep. 402. Thus viewing the case, we need not turn aside to consider the questions presented by the record, respecting the admissibility, and effect of the release of Mr. Butler, to the complainant, of his marital right over the stock. He had no interest in it to release, unless indeed by the marriage, he succeeded at law to the trusteeship, which I apprehend in a court of equity could not affect the rights of the parties.

Having attained the conclusion that Mrs. Butler was a mere trustee for the benefit of St. John & Leavens, and that her guardian transferred the stock without authority of law, let us next proceed to inquire whether, under this state of the case, she is entitled to any relief by her bill.

It is said to be the duty of a bank, or joint stock corporation, not to permit a transfer of its stock, until they are satisfied of the party's authority to transfer. Angell & Ames on Cor. 451. So, it has been held, if stock be transferred under a forged power of attorney, the *proprietor* is entitled to have it replaced. Ashby v. Blackwell, 2 Eden, 299; Woodworth on Joint Stock Com. 164.

In Davis v. The Bank of England, which was a special action on the case against the bank, for breach of duty, in

permitting the plaintiff's stock to be transferred under a forged power of attorney, the question was presented, whether the bank, or the true owner of the stock should be the loser by the forgery, and Best, C. J., in delivering the opinion, says: "The bank may take reasonable time to inquire, and require proof that the signature to a power of attorney is genuine. It is the bank, therefore, and not the stockholder, who is to suffer, if for *want of inquiring* (and it does not appear that any inquiry was made in this case,) they are imposed upon, and allow a transfer to be made upon their books, without a proper authority. We cannot do justice to this plaintiff, unless we hold, that the stocks are still his," &c. The facts presented a case, in which one of two innocent persons must suffer. The bank was deemed most in default, and therefore should be required to bear the loss. In that case, as in this, the transfer was required to be made upon the books of the institution, and the bank was therefore very properly considered the custodiary, or trustee of the shares, and bound to execute the trust with proper diligence and care, and responsible to the true owners of the stock for any negligence or misconduct. The case of Lowry v. The Commercial and Farmers' Bank of Baltimore, decided by Judge Taney in the circuit court for the district of Maryland, a report of which has been furnished us, proceeds upon the same ground. That was a bill to recover the dividends due upon stock, which had been disposed of by one of two executors, in violation of the trusts declared in the will of the testator, which stock had gone into the hands of a *bona fide* innocent purchaser, but the bank before whose officers, and upon whose books the transfer was made, was in possession of a knowledge (or there were circumstances sufficient to charge it with such knowledge) that the executor was misapplying the stock, to his own private use. The court say, "ought the loss to be borne by the complainant, who has committed no fault, and been guilty of no negligence, or by the bank? The established principles of equity seem to require, that the loss should be borne by the party by whose negligence, or misconduct the loss was occasioned." These are the authorities relied upon by the plaintiff, and if she were in equity the *real owner* of the stock, they would be conclusive of the

case in her favor. But we have shown she has no equitable interest in it. She is but a trustee, and does not seek the aid or direction of the court in furtherance of the trust, but that the court may assist her in violation of it, to recover the dividends which have actually been paid to the *cestui que trust.*

It seems to be agreed, that in property of this description, (stocks in incorporated companies,) the legal title may exist distinct from the equitable. Now suppose, in this case, no attempted transfer had been made, and no dividends had been paid by the company, and Mrs. Butler had claimed the stock as an advance, but the company had been notified by St. John & Leavens that she was merely a trustee; that their firm had advanced the money; that they held the certificate of stock; that the purchase was not intended as a gift, but was made in the name of complainant, to give the stock the appearance of large distribution;—could not the company have compelled the conflicting claimants to have settled their controversy, by the exhibition of a bill of interpleader? It is said the Bank of England is not bound to notice any trust of public stock standing in their books; that all they have to do, is to look to the legal estate, &c. 1 Daniels's Ch. Prac. 187. This arises out of the spirit and policy of the several acts of parliament, by which the public stocks and annuities are committed to the management of that institution. Without the application of such a rule to the Bank of England, wielding as it does such an immense amount of stock of a character which might otherwise engender much litigation, it would be greatly embarrassed in its operation, and would have constantly to resort to a court of chancery to settle controversies for its own protection. But such is not the law, as applicable to the company now litigating. In cases where the rights of third parties are involved, we see no reason why this company should not be subject to the same legal, and moral obligations which apply to individuals. If I place funds in the hands of my agent, to invest in shares in the company, in my name, and for my benefit, and he cause the shares to be transferred in his own name, being forbidden to recognize him as the owner, and fully advised of the circumstances of the purchase, the company, in my judgment, would be responsible, should it permit the agent afterwards to trans-

fer the shares so as to defeat my equitable right.    But where money in the public funds is claimed by two parties, the Bank of England may, for its protection, file a bill of interpleader.

We are of opinion the Merchants' Insurance Company could have maintained such bill in this case, before recognizing the title of the *cestui que trust.* "A bill of interpleader," says Lord Cottenham, in Hoggart v. Cotts, 1 Cr. & Ph. 197, "lies where the plaintiff may say, 'I have a fund in my possession in which I claim no personal interest, and to which you, the defendants, set up conflicting claims; pay me my costs, and I will bring the fund into court, and you shall contest it between yourselves.' The case must be one in which the fund is the matter of contest between two parties; in which the litigation between them will decide all their respective rights with respect to the fund."

It is no objection to such bill, that one of the defendants has a right of action cognizable at law, and the other only an equitable demand.    Scuyler v. Pelissier, 3 Edw. Ch. Rep. 71, 191; 1 Daniels's Ch. Pr. 24-5, n. 1; 1 Spence's Eq. Jur. 660, marg.; Mitf. 48, n. f.; 1 Fonb. Eq. 4th Am. ed. 28, n.; Richards v. Salter, 6 Johns. Ch. Rep. 447.

In Readfearne v. Ferrier et al. 1 Done's Ho. of Lords Rep. 50, it seems an interpleader was allowed in a case, bearing some analogy to this.    One David Stewart had purchased a share in the Edinburgh Glasshouse Company, which was a private society.    By the regulations of this company, the shares could be held by individuals only.    The share stood on the books of the company in the name of Stewart, but he had really purchased for the firm of Stewart & Somervail. Afterwards, Stewart assigned to Readfearne for a valuable consideration; the latter having purchased in good faith, and without notice of Somervail's equity, intimated the assignation to the company, but no transfer of the share was made upon their books.    Both Readfearne and Somervail claiming the share, the company raised, what is termed in Scotland, the action of *multiple poinding*, (corresponding to the English bill of interpleader,) to adjust the conflicting claims of

101

the parties. The proceedings were sustained upon appeal to the House of Lords, and Readfearne adjudged to have the better right. See also Darden's adm'r v. Burns's adm'r, 6 Ala. Rep. 362.

But having this right to regard the trust which attached to the stock, and to ask the aid of the court for its protection, the company could waive a judicial investigation, intended for its security, and elect at its peril to recognize the claim of either. This it has done, and the question is, did it pay the dividends to the *true owner?* Has it recognized, and does it still recognize, that party as the proprietor, to whom the court would have decreed the dividends, as well as the legal title? This it has also done. The substantial justice of the case has been attained. The true beneficial owner has the property, and is in the enjoyment of it, and the trustee, under the circumstances, could never be made liable respecting the stock, nor has she sustained any injury by the unauthorized proceedings by which it has been transferred. The court in such case will look to the result, or end, if it be such as it would have decreed, rather than to the informal, or unauthorized mode of procedure, by which the parties have arrived at it. In such case it may well be said, " *quod fieri non debet, factum valeat.*" 5 Sim. 555.

The trustee in this case, having no interest, and no ulterior duties to perform with respect to the trust, comes into court, and seeks to recover dividends which have been paid to the *cestui que trust,* when, if recovered, she would be required to refund. There is no equity in her application, and in our judgment, the bill was properly dismissed. The maxim is, " that will be ratified when done, which the court upon application would order to be done." Harris v. Alcock, 10 Gill & Johns. 227. As to the character of complainant's title, see Cook v. Kennerly & Smith, 12 Ala. Rep. 42; Hill on Trustees, 316; Lewin on Trusts, 477, 489, 498; 13 Ala. Rep. 698. See as to her right to relief, 3 Ves. 757; 5 Sim. 555.

We have not deemed it necessary to notice the effect of the supposed acquiescence of Mr. Butler, to the settlement made between Benjamin Leavens as executor of Joshua, and

the survivors of the firm, in which the transfer of this stock was embraced; neither have we alluded to the fact of the settlement had between the guardian, and the complainant, and her husband. The view we take of the rights of the parties, in respect to the character of the purchase, renders further inquiry unnecessary. Decree of the chancellor affirmed.